Herbert W. Virgin, Jr., Plaintiff-Appellant, v. American College of Surgeons, a Corporation, Paul Hawley, Director of the American College of Surgeons, and Michael L. Mason, Secretary of the American College of Surgeons, Defendants-Appellees.

Gen. No. 48,758.

First District, Second Division.

May 29, 1963.

Sears, Streit, Tyler & Dreyer, of Chicago (Barnabas F. Sears, James N. Kosmond and Gerald M. Sheridan, Jr., of counsel), for appellant.

Vedder, Price, Kaufman & Kammholz, of Chicago (Lawrence Howe, Jr. and James S. Petrie, of counsel), for appellees.

MR. PRESIDING JUSTICE BRYANT delivered the opinion of the court:

This is an appeal from a judgment in actions at law and in chancery brought by plaintiff, Dr. Herbert W. Virgin, Jr., against the American College of Surgeons, a corporation, and against individual defendants, Paul Hawley, Director and Michael L. Mason, Secretary, of said corporation. The action at law was for the issuance of a writ of mandamus commanding all defendants to reinstate plaintiff as a Fellow of the American College of Surgeons and to expunge from its records all matters relating to the expulsion of plaintiff.

The Court found the issues against the plaintiff and in favor of all defendants, denying plaintiff's petition for writ of mandamus and dismissing plaintiff's application for declaratory judgment.

Plaintiff at the time of the trial was 53 years of age. He is married, has three children, two boys and one girl, then 23, 21 and 18 years of age. He is a graduate of Northwestern University Medical School and is a member of the Dade County Medical Society, Florida Medical Association, the American Medical Association, the Southern Medical Association and a Fellow of the Southeastern Surgical Congress, the American Academy of Orthopedic Surgeons, the International College of Surgeons and the defendant College.

He has been an orthopedic surgeon for 24 years, has practiced orthopedic surgery in Florida since 1940, and in Miami since 1943. Prior thereto he practiced in Wisconsin and was licensed there and in Illinois. He is frequently called upon to testify in court because

of the nature of his practice. Over the five years preceding trial of this case, his testimony has been about 55–60% for the defense. He was recognized by the President of the Greater Miami Chapter of the College as "probably the best technical orthopedic surgeon in Miami."

Dr. Virgin applied for Fellowship in the defendant College in 1940. After a thorough investigation into his professional qualifications and moral and ethical standing, he was admitted to the College as a Fellow in 1947.

Defendant, the American College of Surgeons, is incorporated as a corporation not-for-profit under laws of Illinois. Its principal place of business is in Chicago, Illinois, where it owns property of substantial value. Defendant, Paul Hawley, is the Director and defendant Michael L. Mason, is the Secretary of the American College of Surgeons.

The objects of the American College of Surgeons, as stated in its articles of incorporation, are:

> "The purpose or purposes for which the corporation is organized is to establish and maintain an association of surgeons, not for pecuniary profit but for the benefit of humanity by advancing the science of surgery and the ethical and competent practice of its art; by establishing standards of hospital construction, administration and equipment, and all else that pertains to them; by engaging in scientific research to determine the cause, nature and cure of disease; by aiding in better instruction of doctors; by formulating standards of medicine; and methods for the improvement of all adverse conditions surrounding the ill and injured wherever found. To accomplish these benevolent and charitable aims, it shall be within the purposes of this corporation to use those means which from time to time may

355

<br>

seem to it wise, including research, education, the establishment and maintenance of libraries, museums, and other agencies or institutions appropriate hereto, and the cooperation of any other such activities, agencies or institutions already established or which may hereafter be established."

The authority for governing the American College of Surgeons is vested solely in the Board of Regents of the College. Dr. I. S. Ravdin was the Chairman of the Board of Regents and Dr. Loyal Davis was Vice-Chairman. Dr. Paul Hawley, Director of the College, is the chief executive officer of the College and in general charge, under the bylaws, of all matters of administration of the College under the direction of the Board of Regents. He is head of the College's full time staff but not a member of the Board of Regents. Prior to becoming Director he was chief executive officer of the National Blue Shield and Blue Cross insurance corporations for two years. Prior to that he was Chief Medical Director for the Veterans' Administration for 26 months. He served for 30 years in the regular Army during which he had been involved in 8 or 10 courts martial in the capacities of witness, part of the court and defense counsel. He has been a physician for 45 years but is not a surgeon, the extent of his medical practice being "largely epidemiology and tropical medicines."

Dr. George Stephenson is an Assistant Director of the College and all "judiciary problems" come within his department. Dr. Robert Myers is also an Assistant Director for the College. Among other things, he conducts investigations on behalf of the College.

The initial contact in getting the College to investigate Dr. Virgin was made in late 1954 when Dr. Arthur Weiland discussed the Virgin "situation"

with Dr. Stephenson at a State Credentials Committee meeting in Jacksonville, Florida.

The personal antagonism or feud between Weiland and Virgin for many years was known. Weiland and Virgin often testified on opposite sides of personal injury suits, Virgin for plaintiff and Weiland for defendant.

After the American Board of Orthopedic Surgery refused to institute disciplinary proceedings, Dr. Spurling wrote "General Hawley" on February 8, 1955 about the professional and ethical qualifications of Dr. Virgin. He enclosed his correspondence with the American Board of Orthopedic Surgery and a letter to Spurling from Dr. Weiland, stating that Weiland would be "most certainly more than willing to go ahead" with Spurling on the Virgin matter; he had many of his "attorney friends" gather copies of testimony in which he was marking pertinent passages; that the "best way to get this thing going" would be for Spurling, himself, to write the Director of the College and suggest that the Dade County Chapter of the College be asked for a report on Dr. Virgin's activities. Dr. Weiland said "I can assure you that if this is done, we will carry our end forward. In the event you do not feel that this is the right way, please let me know and we will go along on it together just as we planned when you (Spurling) were down here."

On March 18, 1955, Dr. Weiland replied to Myers' letter of February 11, 1955, that he did not feel it was necessary to prefer "definite charges" against Dr. Virgin but he did have numerous pertinent exhibits which were "prepared and ready along with Dr. Spurling's data" and they would be prepared to exhibit them "at any time you care to call the investigation."

When the Virgin investigation began in February, 1955, Section 4, Article IX of the College Bylaws provided that, in questions of fitness of a Fellow, the Director might ask that "an investigation be made by the Judiciary Committee or other Committee . . . in the Fellow's State, province or other area." Section 5, Article V of the Bylaws provided for the establishment of Judiciary Committees which were subject to the control of and reported to the Board of Regents. A Judiciary Committee for the Florida area was in existence during the Virgin investigation.

Myers did not begin his actual investigation until after June 4, 1955 when Section 4, Article IX was amended allowing the Director to request investigation by an "individual," in addition to allowing the Director to ask for investigation by a "Judiciary Committee or other Committee," and eliminating the requirement for investigation within the Fellow's own state. There was no provision in the College Bylaws for the "individual" investigator to report directly to the Board of Regents. Dr. Myers testified that he did not know if the Virgin investigation had anything to do with the amendment of Section 4, Article IX but he did not start his investigation until after it was amended.

On June 15 and 16, 1955, Meyers arranged with Weiland by telephone call and confirming letter that he would stop to see Spurling on June 5 and start in Miami on July 6, leaving his return date open, "as I plan to spend as much time as necessary to accomplish the investigation." On June 17, Weiland wrote Hawley, requesting that, "for the protection of us all," a representative of the Dade County Chapter be present as an observer at the conference with Myers on July 6.

After Weiland and Myers made the arrangement for the meeting in Weiland's office, Myers wrote Dr. Virgin on June 23, 1955, requesting an interview on

358

July 7, or 8 to "develop information about certain aspects of your surgical practice."

On July 6, 1955, Myers participated in a meeting in Weiland's office which lasted from 9:30 a. m. or 9:45 a. m. to 3:00 p. m. or 3:30 p. m. All or nearly all of the doctors taking part in this conference were friends of Dr. Weiland when the meeting was to investigate Dr. Virgin. It did not occur to Myers that Virgin ought to be there to hear the accusations against him. Myers did not inquire as to whether the doctors present testified frequently for defendants.

Myers saw Virgin for the first time on July 8, 1955. During the interview on July 8, Myers interrogated Virgin, as to various matters of his practice over a ten-year period. Myers testified that the following cases were discussed: the Wesley Midget case, the Karl King case, Manheim v. Pierce, the Goff case, the Rose Collins case, and the Jerry Cantor case. He testified that they did not discuss Kenney v. Temple and he could not recall if they discussed the Maule Industries letter.

Myers told Virgin that there had not been any complaints filed and did not disclose the source of his information. Myers did not ask for any information after the July 8 interview. After Myers left, Virgin wrote names of patients mentioned by Myers on the back of an envelope but made no other notes.

The "Judiciary Case" was a five-page document prepared, largely but not exclusively from the 25-page Myers report. It was the statement of the case against Dr. Virgin which was presented for consideration by the Board of Regents.

The "Judiciary Case" contained the following: about one-third consisted of general remarks about Dr. Virgin's background, his relationship with Weiland and the investigation of Virgin; Virgin was accused of "Testimony to encourage excessive awards" in the Midget, King, Goff, and Cantor cases; he was

accused of "False Testimony" in the Collins, King, Manheim and Wilkes cases; accusations of "Questionable Surgical Judgment" were made in connection with the King, Collins and Bender cases; Virgin was accused of "Excessive Fees" in the King, Collins and Midget cases with reference made to a lower fee in the Keirney case; he was accused of "Self-Laudation" in the Maule Industries letter; the charge of "Patient Pirating" was made in the Bender case; under "Poor Medical Records," Virgin was accused of "suspension" at Mercy Hospital for being 50 records in arrears, using a female technician to make progress notes, "demotion" at St. Francis Hospital for failure to write records, and writing a late operative note in the King case.

At the end of the "Judiciary Report" under "Summary," Hawley approved a statement that "the evidence would seem to show" that Virgin was guilty of false testimony to encourage excessive awards, charging excessive fees, self-laudation, "patient pirating" and poor medical records. Hawley also approved a statement that "these are adequate reasons for expulsion" and recommended that Dr. Virgin be expelled.

Although Hawley later wrote to Loyal Davis that "we had three times" the amount of evidence presented to the Board of Regents but Hawley had limited the presentation to charges "about which there could be no question."

On August 29, 1955, plaintiff received a letter from Stephenson stating that his "name was to be presented to the Board of Regents . . . for punitive action" under Sections 3 and 4, Article IX of the amended bylaws, that "charges to be preferred" were based on information that Virgin's conduct had "been injurious to the reputation and best interests of the College, is inconsistent with its purposes, and shows a failure to maintain the standards of conduct

set forth in the Fellowship Pledge" and that Virgin could appear at the meeting if he cared to.

Section 4, Article IX of the College Bylaws, as amended June 4, 1955, provided: "Before disciplinary action is taken . . . written notice shall be sent by registered mail" to the Fellow "not less than thirty (30) days prior to a regularly called meeting of the Board" advising him that "disciplinary action may be taken against him at such meeting; and that he may appear at the meeting, . . . be heard and submit such evidence as he deems proper" to show action should not be taken.

On September 7, 1955, Dr. Virgin wrote Dr. Hawley, acknowledging Stephenson's letter of August 29, 1955 and stating: (a) he assumed that no final action was contemplated at the October meeting of the Regents because of the short time allotted and because Stephenson's letter referred to charges "to be preferred"; (b) he assumed that if it were decided at the October meeting that charges should be preferred, the matter would be referred to the Judicial Committee established in the Greater Miami Chapter of the College for formal investigation and hearing; (c) he thought that no formal charges had been lodged yet, because of Myers' statements and Stephenson's letter to that effect; (d) it would be necessary for him to know the formal charges, if any, which were preferred against him so he could discuss them intelligently; (e) he requested copies of charges made, information about the patients involved and the persons making complaints, information regarding names and dates of cases in which testimony was questioned, specification of canons of ethics and parts of the Fellowship Pledge allegedly breached, a copy of Myers' report; and (f) he inquired whether it was desired that he bring witnesses and evidence to the October meeting, whether the meeting was merely to determine if charges should be made, and if the mat-

361

ter would be referred to the Judicial Committee in Miami if formal charges were made. Dr. Hawley was aware of the contents of Virgin's letter and consulted counsel in determining how to answer it.

On September 7, 1955, Dr. Ravdin, Chairman of the Board of Regents wrote Stephenson requesting knowledge of the case against Virgin. On September 13, 1955, Stephenson replied to Dr. Ravdin's letter, enclosing a copy of the "Judiciary Case" and stating that Virgin had been asking for detailed specification of names, dates and places and that they would consult counsel to determine an "appropriate answer."

Not until September 21, 1955, did Stephenson answer Virgin, sending a copy of the bylaws and quoting the June 4, 1955 amendment, explaining that it was not mandatory for the Director to have a "Judiciary Committee" investigate, emphasizing that disciplinary action might be taken "at such meeting," stating that the proceedings were not "legalistic" and that it would not be necessary for Virgin to bring witnesses to appear before the Board. No details were given as to the nature of charges to be preferred.

On September 29, 1955, Dr. Virgin again wrote to Stephenson, acknowledging Stephenson's letter of September 21 with the bylaw amendment and Stephenson's original letter of August 29, stating that neither of those letters nor any previous communication have given him any information as to the nature of the charges or cause of the investigation, requesting that he be given an opportunity to know the nature of the charges, by whom they were made and the facts to justify the investigation in view of the fact that disciplinary action might be taken against him at the meeting of the Board of Regents. He stated that, at present, he was without any idea of what evidence would be proper to bring before them. He requested only the right to an opportunity to present his evidence as allowed by the bylaw. He also asked for

362

assurance he would only be examined on matters discussed with him by Myers so he could at least be adequately prepared on them.

On October 6, 1955, Dr. Stephenson wrote to Dr. Virgin, stating that Virgin's letter of September 29 had been discussed with Hawley who said they could not foretell or limit the questions to be asked by the Board but that the Board would undoubtedly delay a final decision if they felt the answers were unsatisfactory because of his lack of specific information.

On October 13, 1955, Stephenson wrote Virgin, notifying him of the exact time he would appear before the Regents. On October 14, 1955, Virgin wrote Stephenson notifying him that he would meet with the Regents on October 30 and requesting the exact time and place. On October 15, 1955, Virgin wrote Stephenson, acknowledging his instructions to appear at 11:00 a. m., Sunday, October 30, 1955 at the Conrad Hilton in Chicago.

On October 30, 1955, Dr. Virgin appeared before the Board of Regents of the College and was interrogated concerning various matters of his professional practice extending over a ten-year period. He was accompanied by his attorney, Ben Hendricks of Miami, Past President of the Miami Bar Association. They brought to the meeting a large suitcase and large briefcase full of material about the cases on which Dr. Virgin had been questioned by Dr. Myers.

Immediately prior to Virgin's appearance before the Board, and in his absence, the "Judiciary Case" was read to the Regents and an oral presentation was made by Stephenson. Copies of the "Judiciary Case" had been distributed to the Regents by placing them on their desks on that morning.

Mr. Hendricks then reviewed the steps leading up to hearing and stated that they had attempted to prepare those matters discussed by Myers and Virgin.

363

Dr. Virgin was then interrogated by Dr. Ravdin and other Regents. When Dr. Virgin attempted to use the King transcript to clarify his testimony about the Naffziger Test, Ravdin curtly refused to allow him to do so.

The following cases listed in the "Judiciary Case" were not touched upon at all in the interrogation of Virgin by the Board on October 30, 1955: The Wesley Midget case; the Hugh Goff case; the Jerry Cantor case; the Gloria Manheim case; the Wilkes case; the portion of the King and Collins cases listed under "Questionable Surgical Judgment"; the Jules Bender case; the King, Collins, Dorothy Keirney and Midget cases as to excessive fees.

The following subjects were discussed for the first time at that meeting: The Maule Industries letter; whether Virgin was a "Plaintiff's Doctor"; whether he made contingent fee arrangements; and Blue Shield fees.

When the interrogation was concluded Dr. Ravdin remarked how "very happy" they were "that you have come here today"; that they would "give this whole matter very careful thought"; and that "we may ask you to come back and see us again." Dr. Virgin then replied that he would "be glad to" and would like to at anytime be able to "present a fuller and better developed presentation of my side." Mr. Hendricks again requested a copy of the charges "in order that we may be able to send you various information." Dr. Ravdin replied, "The Regents have made no charges against Dr. Virgin. The Regents have said that these charges have come to the College and we have asked Dr. Virgin to come here merely that he might give us his idea of these charges."

Mr. Hendricks then remarked that "the use of the words 'punitive action' in the very outset of the matter no doubt caused alarm and concern"; and that they had come "prepared as to any case" the Board

"wished to go into, we have as near as possible the complete records for submission to you gentlemen to show that," whereupon Dr. Ravdin cut him off remarking: "Well, let's say that the letter might well have said 'possible punitive action.' Thanks very much." Mr. Hendricks replied, "Thank you very much," Dr. Ravdin responded "Yes sir, Mr. Hendricks. Thank you for coming," and thereupon Dr. Virgin and Mr. Hendricks left the room.

Dr. Hawley, present throughout and experienced in military courts martial as both judge, witness and defense counsel, described the proceeding of October 30th as "one of informing Dr. Virgin of the substance of Exhibit No. 9," of "an exploration of the charges brought against Dr. Virgin and giving him an opportunity to state his position upon," agreeing that the "charges" were not presented by the College; that Dr. Virgin "was being heard, but there was no proceeding at that time to consider his expulsion." As to whether Dr. Virgin was "being given a hearing in the term in which it was generally understood," Dr. Hawley would say yes if the term "preliminary hearing" was used. As to whether the College on October 30th was "merely having a conversation with Dr. Virgin," Dr. Hawley replied that "it was a little more than that." When asked "how much more," he replied, "Well, it was no more than that" and that when Dr. Ravdin "described the proceedings as conversations with the individual (which he did not), he was correct"!

No final action was taken against Dr. Virgin at the October meeting. A special Committee composed of Doctors Davis, Cole and McKittrick was appointed to investigate Dr. Virgin, collect further information and report at the December 1955 meeting of the Regents.

Dr. Davis began the committee meeting by stating that Virgin made a bad impression by bringing his

365

lawyer. Davis did most of the talking. Cole talked to Virgin for a few minutes at the end. The following subjects were discussed: the surgical situation in Miami; relationships of doctors and groups of doctors there; Virgin's relationship to Weiland; fee problems in Miami; the Mercy Hospital "suspension"; delinquency in records; progress notes by technicians; and specific cases the names of which Dr. Virgin does not remember. However the Collins case (the nurse) was not discussed. Virgin produced some documents in connection with the matters discussed. He did not have the transcripts that he had had at the Board meeting with him. At the end of the meeting which lasted about 90 minutes, Davis commented: "Well, it looks as though this is clearly a question of an older man jealous of a younger man coming into the community and making a success."

The committee met with Myers and Stephenson on December 3 and agreed that both Dr. Virgin and Dr. Weiland had brought discredit to the College, that Weiland should be called before the Board also and that both Weiland and Virgin should be penalized equally.

On December 28, 1955, Hawley wrote Weiland that the Board of Regents requested he meet with it at his "earliest convenience" to pursue some questions raised in a recent investigation and would he "please inform" Hawley if he would be present at the February meeting. No punitive action was mentioned. On January 13, 1956, Hawley wrote Davis that Weiland would appear before the Board on February 13, 1956.

On January 20, 1956, Ravdin wrote Hawley that he had spoken to four undisclosed doctors in Miami the day before about the Virgin matter; he spoke to Weiland again; general comments about the Miami situation; he hoped this matter could be straightened out at the next Regents' meeting; and he "was very happy to have gone to Miami and to have personally

looked into the situation, for it will give me a background for discussion with the Regents."

Hawley had invited Spurling to dine with the Regents on Saturday evening (the night before he testified); and Hawley did not want the Regents to make another "serious error" like they did in "whitewashing Alstea Callahan" in Birmingham.

Dr. Lee wrote Dr. Ravdin on January 26, 1956 that he was "appalled" by the conclusive, documentary and irrefutable evidence presented against Virgin, he admired Weiland whose motives are the highest, and "Please do not fail us now." Ravdin forwarded it to Hawley with the comment, "Sure it is that at our next meeting we must take definite action in regard to this situation."

Dr. Virgin received no notice, by registered mail or otherwise, to appear at the February 10–11, 1956 meeting of the Board or that disciplinary action might be taken against him at that meeting, nor was he there.

Dr. Spurling left and a lengthy discussion ensued resulting in a vote to expel Dr. Virgin for "conduct injurious to the good name of the College."

On February 23, 1956, Hawley wrote to Dr. Virgin that the Board voted unanimously (1) that his "professional conduct has upon occasion not been in accordance with the principles of the American College of Surgeons" and (2) to terminate his Fellowship. Section 3, Article IX of the College Bylaws provided: "The Board of Regents may expel . . . any Fellow" for conduct "injurious to the good order, peace, reputation, or best interest of the College," or conduct "derogatory to its dignity, inconsistent with its purposes" or conduct showing "a failure to maintain the standards of conduct set forth in the Fellowship Pledge."

Dr. Virgin, through his attorneys, requested reinstatement in the College on April 24, 1956, and re-

367

newed his request for reinstatement and requested the reasons assigned for expulsion on May 14, 1956. These requests were accompanied by the condition that further disciplinary proceedings be referred to an impartial third party for hearing. The College, through its attorney on June 13, 1962 notified him that the Board refused to reinstate him advising also that his expulsion arose "from the decision of the Board of Regents that his conduct has been injurious to the reputation and best interest of the College, inconsistent with its purposes, and has shown a failure to maintain the standards set forth in the Fellowship Pledge." The only ground actually set out in the minutes of the February meeting was "conduct injurious to the good name of the College." The Bylaws of the College afford Dr. Virgin no further remedy or relief.

There had never been any notice to Dr. Virgin that he was to be subjected to discipline because "his conduct has been injurious to the reputation and best interest of the College, inconsistent with its purposes, and has shown a failure to maintain the standards set forth in the Fellowship Pledge," or even that his "conduct [had been] injurious to the good name of the College."

■ Membership in a voluntary association is an interest of substance within the scope of judicial control. This has been the rule in this country for a number of years.

"Some associations have a stranglehold upon their members through their control of an occupation . . . which can ill be spared. In such there is an operative policy in favor of relief against wrongful treatment." Chaffee, The Internal Affairs of Associations, 43 Harv L Rev 993, 1022 (1930).

■ The principle that a member of a professional association who is wrongfully expelled has an "interest of substance" which the Judiciary will protect has been clearly engrained in the law of the United

States and England. In the leading case in the United States of Reid v. Medical Society, 156 NYS 780, 783 (Sup Ct, 1915), wherein a physician was reinstated in a medical society after unjust expulsion, the Court stated at page 783:

> "Membership in the County (Medical) Society carries valuable privileges relating to the practice of his profession, both educational and professional, which latter advantages have a potential financial value, and also carry property rights, from which privileges and enjoyment of property rights an expelled member is deprived."

Whether the "interest of substance" which accrues to a member of a professional association is called a "property right," "contract right" or merely the "member's relation to the association," there is a growing awareness that wrongful expulsion from a voluntary professional association has such a serious effect on the ability of the professional man to successfully pursue his livelihood and that it is a judicially protectable interest. Chaffee, The Internal Affairs of Associations, 43 Harv L Rev 993, 998–1008 (1930). See 20 ALR2d 536–571.

Courts annul expulsions from voluntary associations when they are (1) not in accordance with the constitution and bylaws of the association, (2) influenced by bias, prejudice or lacking in good faith, or (3) contrary to rudimentary due process or natural justice.

In Medical & Surgical Society of Montgomery Co. v. Weatherly, 75 Ala 248, at page 258:

> "The rule of law is known to be, that this power resides generally in the body of every corporate society, that it is judicial in its nature and must be exercised by a vote of the society expressing the corporate will, and ordinarily the records or minutes of the body must show that

369

the requisite steps were taken in compliance with the charter and bylaws of the corporation, after reasonable notice to the party charged, either express or implied."

In Illinois it has recently been decided as follows, O'Brien v. Matual, 14 Ill App2d 173, page 197, 144 NE2d 446 as follows:

"But a court of equity will interfere where it appears the provisions of the Constitution have not been observed, where the association, its officers, or tribunals are not acting within the scope of its or their powers or in accordance with the Constitution, or the member or subordinate body has not been afforded those rudimentary rights which will give him or it an opportunity to defend against any charges made, including reasonable notice thereof, an opportunity to be present at a hearing, to confront and cross examine his or its accusers, to make a defense, and to endeavor to refute any evidence adduced in support of the charges."

And, it was also decided in Werner v. International Ass'n of Machinists, 11 Ill App2d 258, at page 279, 137 NE2d 100:

"While all of the authorities are to the effect that a court will not reverse the expulsion of a member of a union for an infringement of its rules where it appears that the expulsion is ordered in accordance with the constitution and bylaws of the union, it is also equally well settled that courts will interfere with the decision of an association expelling one of its members if it appears that the rules of the association governing expulsion have not been observed or if the accused member has not been afforded those rudimentary rights which will give him an op-

portunity to defend against the charges made. These rights include notice to the accused of the charges made against him, an opportunity to be present and confront and cross-examine his accusers and an opportunity to make a defense and refute the evidence produced in support of the charges. (Carson v. Glass Bottle Blowers Ass'n of United States & Canada, 37 Cal2d 134, 231 P2d 6, 21 ALR2d 1387.)"

■ It is, therefore, clearly apparent that Dr. Virgin was not given notice according to the bylaws. He never received any registered mail as the bylaws required, nor was he at anytime allowed to confront his accusers or given a fair hearing upon the charges against him. He was never given any idea of what charges were presented against him. The hearing did not in any way meet the requirements of due notice and proper hearing upon the question of his expulsion and is, therefore, void and the expulsion must be set aside.

It is clear that the requirements were not met and the hearing is, therefore, invalid.

■ We hold that Dr. Virgin was never legally expelled from the college and the mandamus must be directed to be entered.

The defendants have declared that the college is not interested in retrial of Dr. Virgin at this late date. Therefore, the judgment is reversed and cause remanded with directions to enter judgment for plaintiff, awarding a writ of mandamus, commanding defendants to reinstate plaintiff as a Fellow of the American College of Surgeons.

Judgment reversed and cause remanded with directions.

BURKE and FRIEND, JJ, concur.