PARSONS COLLEGE, etc., Plaintiff,

v.

NORTH CENTRAL ASSOCIATION OF
COLLEGES AND SECONDARY
SCHOOLS, etc., Defendant.

Civ. A. No. 67 C 1109.

United States District Court
N. D. Illinois, E. D.

July 26, 1967.

Barnet Hodes, G. Gale Roberson, J. Herzl Segal, Edwin A. Wahlen, Chicago, Ill., for plaintiff, Arvey, Hodes & Mantyband, Chicago, Ill., of counsel.

L. Dow Nichol, Jr., Edwin H. Conger, Chicago, Ill., for defendant, Tenney, Bentley, Guthrie & Howell, Chicago, Ill., of counsel.

## MEMORANDUM OF DECISION WITH RESPECT TO THE MOTION OF THE PLAINTIFF FOR A PRELIMINARY INJUNCTION

JULIUS J. HOFFMAN, District Judge.

Parsons College has brought this action to enjoin the North Central Association of Colleges and Secondary Schools from effectuating its decision to withdraw the accreditation of the College. The controversy presents novel and far-reaching questions concerning the law governing the accreditation of educational institutions and concerning the role of the courts in that evaluative process.

The complaint was filed on June 27, 1967, on the eve of disaccreditation. By action of the Association on April 6, 1967, the College was to be removed from membership, and thereby from the accredited list, on June 30, 1967. To preserve the status quo until a hearing could be held, the College sought a temporary restraining order, to take effect immediately, postponing the threatened action. By stipulation of the parties, it was agreed that the status quo would be preserved without court order until the disposition of the College's motion for a preliminary injunction, which in turn would remain effective, if granted, until the entry of a final decree upon completion of a full trial on the merits. Hearings on the requested preliminary injunction have been concluded, and the motion for that relief is presented for decision.

The North Central Association of Colleges and Secondary Schools was established in 1895 as a voluntary association of educational institutions, formed for the stated purpose of "the development and maintenance of high standards of excellence for universities, colleges, and secondary schools, the continued improvement of the educational program and the effectiveness of instruction on secondary and college levels." The Association was chartered as a nonprofit corporation under the laws of Illinois in 1963. Its area of operations embraces nineteen states in the central United States, and

includes Iowa, the location of Parsons College. In that area, some 493 colleges and universities and 3754 secondary schools have become members. Under the By-Laws of the Association, membership is purely voluntary and must be initiated by the legally designated governing body of the institution seeking admission. The Association reserves the right to develop and establish criteria for the evaluation of colleges, universities, and secondary schools, to establish conditions for continued membership, and to terminate membership by removing an institution from the approved list.

In practice, membership in the Association has come to constitute accreditation for colleges and universities in its region, and the withdrawal of membership constitutes a revocation of accreditation for an institution. The Association is the authoritative accrediting agency for the area, and its actions are accepted as controlling for a variety of purposes and by a variety of institutions, agencies, and individuals. Attendance at an unaccredited college, for example, may prejudice a student's application for graduate study at another institution, and the absence of accreditation may impair the ability of a college to obtain financial support from private and governmental sources. In common understanding, the fact of membership in the Association is tantamount to a certification of educational quality for the member school.

Parsons College is a private liberal arts college in Fairfield, Iowa. Founded in 1875, it became a member of the Association, and was thereby accredited, in 1913. This accreditation was withdrawn in 1948 and restored in 1950. In the mid-fifties, the College embarked upon a new course of development that carried it out of the main stream of traditional private colleges. It sought to serve the needs of students whose poor academic qualifications would have made them inadmissible at conventional schools, including transfer students who had been dismissed for scholastic deficiencies at other colleges. Combined with this goal of providing a second chance, the College sought to demonstrate that an institution of higher learning could be operated successfully solely with the financial resources provided by student tuition charges and fees, without gifts, endowment, or state support. These new policies were implemented in a process of rapid growth and expansion which increased student enrollment from approximately 200 to more than 5,000. The combined pressure of these developments created deficiencies which called its accreditation into question once more. In 1963, the College was placed on probation. With evidence of a trend toward improvement, this probation was removed in 1965 and accreditation was reinstated subject to the stipulation that it be reviewed within three years.

Pursuant to this stipulation, and in accordance with the Association's practice, a team of four experienced educators, trained in evaluative techniques, visited the College on February 23 and 24, 1967. On the basis of the reports prepared by the officers and staff of the College, an examination of College records and files, interviews with faculty, staff, and students, and their own observations, this Examining Team prepared a written report of some thirty-two pages. Following the pattern of the Guide published by the Association in 1966 as a basis for evaluation, the report of the Examining Team addressed itself to seven aspects of the College: its educational purposes and tasks, the availability of resources for carrying them out, the organization and administration of the College, the programs of instruction and curriculum, the faculty and its morale, student life, and student achievement. As a follow-up to the action taken in 1965 with its stipulation for future review, the report of the Examining Team found improvement in some of the noted areas, and hopeful prospects for improvement in others. In still other areas, however, the Team found that improvement which had been hoped for had not been realized, and other deficiencies persisted with no sign of impending change.

For purposes of acting upon questions of accreditation and considering reports of examining committees, the Association subdivides itself into several Commissions consisting of the official representatives of member institutions of like kind. Jurisdiction over colleges such as Parsons is vested in the Commission on Colleges and Universities. This Commission is further subdivided, for purposes of investigation and recommendation, into committees by type of degree granted, with separate committees for institutions conferring doctoral degrees, those granting masters or specialist degrees, those granting bachelors degrees, and junior colleges. Under established practice, the report of the Examining Team for Parsons College was presented for consideration in the first instance to the appropriate Committee by Type. Notice of a meeting of this Committee, to be held on April 3, 1967, to consider the report was sent to Parsons College on March 1, 1967, with an invitation for the attendance of its chief administrative officer and other representatives. The notice advised the College of the practice of the Committee that a copy of the report of the Examining Team is mailed to the institution about one month before the meeting. In fact, the report was mailed some ten days before the meeting.

Pursuant to this invitation, representatives of Parsons attended the meeting, made statements by way of response to the findings of the Examining Team, and answered questions put by the members of the Committee.

In the Association hierarchy, the matter was next referred to the Executive Board of the Commission, which received the report of the Examining Team and of the Committee by Type. Since the annual meeting of the Association was in progress, this Executive Board of the Commission acted upon the question the following day, April 4, 1967, recommending that the College be dropped from membership for "persistent failure on the part of the College to correct certain serious weaknesses in its operation and the Executive Board's lack of confidence in the administrative leadership of the College." This recommendation was transmitted in turn to the full membership of the Commission on Colleges and Universities at its meeting held the next day, April 5. The Commission unanimously voted to accept this recommendation of its Executive Board and to drop Parsons College from membership. Three members of the Committee by Type were present and voted for this action.

Before transmission of this recommendation to the Board of Directors of the full Association for action by the full membership, the Commission offered an opportunity for representatives of the institution involved to consult with the Commission staff to discuss the recommendations and action of the Commission. Although Parsons College was advised of this opportunity to consult and to learn what action had been taken by the Commission, no representative of the College took advantage of the opportunity. This failure was explained in the testimony of the College officers as the product of the impression, which they gained at the hearing of the Committee by Type and from the report of the Examining Team, that no unfavorable action would be recommended. In fact, this impression was accurate to a degree. The Examining Team and the Committee by Type, in recommendations not made available to the College until this suit had been filed, had proposed that Parsons retain its accreditation in a sort of provisional status, subject to conditions to be agreed to by the College, but short of formal probation. The Executive Board disagreed with this suggested course, and voted to drop the College from membership. Reliance upon the favorable impression gained from the subordinate groups, therefore, proved to be unwarranted.

Although the representatives of the College failed to avail themselves of the opportunity to learn of the unfavorable action and to discuss it with the Commission staff during the afternoon of

April 5, the Commission's recommendation to drop Parsons was included in its written report distributed to members who attended the business meeting of the full Association the next morning, on April 6, 1967. Representatives of the College, had they attended the meeting, would have been entitled to speak from the floor and to argue for rejection of the Commission's proposal. No representative attended, and the Association members unanimously, without discussion, voted to drop Parsons from membership.

Upon being advised of this action, the College took advantage of the provision made in the By-Laws for an appeal to the Board of Directors of the Association. Pursuant to these By-Laws, a hearing was first conducted by the Executive Board of the Commission, on June 14, 1967. The meeting lasted approximately two hours, during which time the College representative made oral submissions and presented a quantity of evidence in the form of exhibits and affidavits. On June 23, 1967, the Board of Directors of the full Association conducted a similar hearing, in which representatives of the College were again accorded a full hearing. The invitation for these meetings stated that "neither the College nor the Association will have legal counsel present at the time of your appearance," and no counsel attended for either side. The College, however, had the benefit of the assistance of able counsel in preparing its written appeal and the supporting papers.

On June 24, 1967, the College was advised that the Board of Directors had unanimously voted to sustain the action of the Association taken April 6, 1967, discontinuing the accreditation of the College. The report of the decision of the Board of Directors recounted the history of the College's accreditation difficulties, and noted that sufficient time had elapsed to permit correcting serious deficiencies which previously had been excused because of the recency of the College's reorganization. On the basis of circumstances which raised doubt that the College is providing an adequate educational program for its students, especially those of limited ability, the Board of Directors concluded that the College should be dropped from membership, with the advice that it might re-apply whenever it could provide evidence of having remedied the weaknesses.

Having exhausted its remedies within the Association, the College turned to the courts with the commencement of this action. It is clear from the evidence that loss of accreditation would work substantial and irreparable harm to the College, even if the disaccreditation should ultimately be set aside after a full trial of the merits some six months or a year from now. The intervening commencement of a new academic year would threaten a loss of current student enrollment, a decrease in the number of new students, and the resignation of some faculty members. Much of this harm may be the inevitable product of the action of disaccreditation itself, as publicized by this proceeding, and therefore beyond the reach of equitable remedies. A recognition of this dilemma appears in the College's prayer for a provision in the injunctive decree which would restrain the Association from disclosing that the College was accredited by judicial decree and not by the reasoned judgment of the Association. It may be assumed, nonetheless, that the College has made an adequate showing of irreparable harm to warrant equitable intervention if other requirements were satisfied.

Even the greatest harm, however, will not support the issuance of a preliminary injunction if the defendant has committed no legal or equitable wrong. Without establishing an absolute right to ultimate relief on the merits, the plaintiff seeking a preliminary injunction must at least make a strong showing of probable success on the merits at the full trial to follow. See Riverbank Laboratories v. Hardwood Products Corp., 236 F.2d 255 (7th Cir. 1956); Corica v. Ragen, 140 F.2d 496 (7th Cir. 1944).

In attempting to make this requisite showing that the action of the Association was wrongful, the College has charged, first, that the procedures which led to the decision to discontinue accreditation operated to deny due process, and second, that the decision as a substantive matter was arbitrary in a number of respects.

 Invoking a claim of due process, the College draws no support from the commands of the federal Constitution, as contained in either the Fifth or Fourteenth Amendment. By their terms, these constitutional guarantees control only the action of government. Designed to guard the individual against the overweening power of the state, they do not control the voluntary arrangements or relations of private citizens in their private dealings with each other. Here there is no suggestion that the Association is an arm of government, making its acts the action of the state. With a corporate charter granted under general law, the Association stands on the same footing as any private corporation organized for profit or not. The fact that the acts of the Association in granting or denying accreditation may have some effect under governmental programs of assistance to students or colleges does not subject it to the constitutional limits applicable to government, any more than a private employer whose decision to hire or fire may affect the employee's eligibility for governmental unemployment compensation. The termination of membership in a private association, organized to maintain the standards in a profession or calling, do not, therefore, present a federal question. See Rosee v. Board of Trade of City of Chicago, 311 F.2d 524 (7th Cir. 1963). In a case involving an attack on the accreditation actions of this same Association, the court declared, "[I]t is vain to appeal to a constitutional bill of rights, for such bills are intended to protect the citizen against oppression by the government, not to afford protection against one's own agreements." State of North Dakota by Langer v. North Central Association, 23 F.Supp. 694, 700 (E.D.Ill. 1938), affirmed, 99 F.2d 697 (7th Cir. 1938). The term "due process" is thus something of a misnomer in this field.

The governing law lies outside the Constitution. The parties have not suggested that the law of any state other than Illinois should be applied. The Association is incorporated in that state and maintains its offices there. The action in question was taken at meetings in Chicago.

Since no attempt has been made to invoke the anti-trust laws, the principles of Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), are not called into play.

 The Illinois law governing actions of this kind is not wholly free from uncertainty, however. Speaking generally, the courts of the state have been liberal in their treatment of private association, leaving the members to arrange their affairs as they choose. A series of cases involving the Chicago Board of Trade lays down broad rules of judicial abstention, declaring that the only law applicable to determine the propriety of the expulsion of a member from a private association is the law which he agreed to when he voluntarily chose to join the association, that is, the rules of the association itself. See, for example, Pitcher v. Board of Trade, 121 Ill. 412, 13 N.E. 187 (1887); Green v. Board of Trade, 174 Ill. 585, 51 N.E. 599, 49 L.R.A. 365 (1898); Board of Trade v. Nelson, 162 Ill. 431, 44 N.E. 743 (1896). The strength of this line of authority is evidenced by the recent observation of the Court of Appeals for this Circuit: "No case has been cited or found in which an Illinois court reviewed proceedings before the Board of Trade resulting in suspension of membership." Rosee v. Board of Trade of City of Chicago, 311 F.2d 524, 527 (7th Cir. 1963).

The same principle has been applied in cases involving other kinds of organizations.

"In churches, lodges, labor unions, and other like voluntary associations,

each person, on becoming a member, either by express stipulation or by implication, agrees to abide by all rules and regulations adopted by the organization. Bostedo v. Board of Trade, 227 Ill. 90, 81 N.E. 42. Courts will not interfere to control the enforcement of by-laws of such associations; but they will be left free to enforce their own rules and regulations by such means, and with such penalties, as they may see proper to adopt for their government." Engel v. Walsh, 258 Ill. 98, 103, 101 N.E. 222, 223, 45 L.R.A.,N.S., 353 (1913).

The Court of Appeals for this Circuit has similarly declared that no judge-made principles or statutes are to be applied to control the actions of private associations. See Eads v. Sayen, 281 F.2d 791, 795 (7th Cir. 1960); Talton v. Behncke, 199 F.2d 471 (7th Cir. 1952). In the latter case it is said:

"An unincorporated society such as this, so far as procedure is concerned, has no governing law other than and except its Constitution and By-Laws which constitute a binding contract between all the members and officers. Elevator Operators, etc., v. Newman, 30 Cal.2d 799, 186 P.2d 1. Whether such an association acts properly is to be determined by the authority granted, not by virtue of any statute but by virtue of the Constitution and By-Laws under which it exists and by which the propriety of all its actions is measured. By this compact, plaintiffs, defendant and all other members were bound. Consequently, in examining the validity of the actions of the Board of Directors, we can have recourse only to the question of whether the Constitution and By-Laws authorize the action taken." (199 F.2d, at 473).

Within the limits of judicial review as thus defined, the College has failed completely to show any wrong in the termination of its membership and the consequent removal of accreditation. No violation of the Association's constitution or by-laws is charged or proved. The only assertion which may be regarded as within the scope of this limited inquiry is the College's complaint that the notification of the hearing before the Committee by Type stated that the report of the Examining Team "is mailed to the institution about one month before the meeting", and in fact the report was not mailed until ten days before that meeting. The statement, however, does not qualify as a by-law or rule of the Association; in context, it is no more than a prediction, based on usual practice. In any event, the College has failed to show any prejudice resulting from this delay. Representatives of the College appeared before the Committee, and a favorable recommendation was obtained at that level. Two other hearings, before the Executive Board of the Commission and before the Board of Directors, were held well after the expiration of a month from the date of mailing of the report.

The College does not concede, however, that the scope of judicial inquiry is confined to the question whether the action of the Association was in compliance with its own rules. Relying upon recent decisions of the Illinois Appellate Courts, the College argues that the action must be set aside if it is "contrary to rudimentary due process or grounded in arbitrariness." Virgin v. American College of Surgeons, 42 Ill.App.2d 352, 192 N.E.2d 414 (1st Dist., 2d Div. 1963), principally relied upon, does contain a declaration that "rudimentary due process" must be observed. That declaration may be regarded as dictum, however, in the light of the court's holding that the by-laws of the association had been violated. Robinson v. Illinois High School Association, 45 Ill.App.2d 277, 195 N.E. 2d 38 (2d Dist., 1st Div. 1963), is cited for the requirement that the association action must be free from arbitrariness. The opinion does speak of the requirement, but at the same time it quotes with approval a contrasting principle: "Moreover, it is held that the courts will not undertake to inquire into the regular-

ity of the procedure adopted and pursued by such tribunals in reaching their conclusions. (4 Am.Jur., Associations and Clubs, sec. 17, p. 466)." In any event, the court found no infirmity in the association action.

Standing in contrast with these Appellate Court statements is the holding in People ex rel. Bluett v. Board of Trustees, 10 Ill.App.2d 207, 134 N.E.2d 635, 58 A.L.R.2d 899 (1956), in which the court sustained the expulsion of a medical student from the University of Illinois with no hearing at all before the action was taken, no charges, and no reason given. Which of these varying decisions is to be regarded as the authoritative law of Illinois, binding on a federal court, remains in doubt until the Illinois Supreme Court speaks to the issue. See Stoner v. New York Life Insurance Co., 311 U.S. 464, 61 S.Ct. 336, 85 L.Ed. 284 (1940). It is unnecessary to pursue that conjecture, however, since the College has failed to establish a violation of the commands of any of the several rules.

█ So far as rudimentary due process requires a hearing, there is no doubt that the College was afforded a hearing in fact. Its representatives participated in consultation with the Examining Team, and were heard more formally by the Committee by Type, the Executive Board of the Commission, and by the Board of Directors of the Association. They eschewed the opportunity to be heard by the Commission staff and in the meeting of the full Association. The complaint thus is directed rather at the quality of the hearings held, in three alleged particulars: lack of notice, inadequate standards, and absence of charges.

On the question of notice, the Court can give no credence to the claim of the College that they had no notice that their accreditation was in jeopardy until the action of April 6, 1967, was announced. After a long history of questionable status, the visit of the Examining Team was adequate notice without more. They were therefore on notice that action might be taken at the Association meet-

ing, and they absented themselves at their risk. See Talton v. Behncke, 199 F.2d 471, 473–474 (7th Cir. 1952). In any event, the College was heard by two separate bodies after notice of the action. In the same vein, the College complains that it received no notice of the recommendations of the Examining Team and of the Committee by Type. Again the College failed to avail itself of an offered opportunity for consultation with the Commission staff, which would have supplied the information. Since these were merely intermediate steps to the action of the body with ultimate power to act, no need for giving notice is apparent; the prosecutor need not advise the accused that he has decided to present the matter to the Grand Jury. In any event, the lack of knowledge was not relevant, since the College could not safely have relied on the favorable action, as events proved. Finally, the omission was harmless in any case, since the College argues that its representatives gained the impression, in fact correct, that these recommendations were favorable, and that they acted in accordance with that impression. Knowledge would only have confirmed them in the course of action they did in fact pursue. Their real complaint, it appears, is that they guessed wrong on whether the Executive Board and the Commission would accept these favorable recommendations from the subordinate bodies. No possibility existed to give notice of this action until it had been taken.

Concerning the alleged lack of charges, the College argues that it received no notice of specific claims of wrongdoing and had no opportunity to confront and to cross-examine its accusers. The standards by which it was judged, it claims, were nebulous and vague. But in these respects, the nature of the hearing, if required by rudimentary due process, may properly be adjusted to the nature of the issue to be decided. In this case, the issue was not innocence but excellence. Procedures appropriate to decide whether a specific act of plain miscon-

duct was committed are not suited to an expert evaluation of educational quality. In the related field of the expulsion of students by colleges, a distinction has been drawn between expulsion for misconduct, where a hearing may be required if the school is public, and expulsion for academic failure. See Dehaan v. Brandeis University, 150 F.Supp. 626 (D. Mass.1957).

"Where the real ground of exclusion is not misconduct there is no obligation on the part of the school committee to grant a hearing. * * * Failure to attain to a given standard of excellence in studies is not misconduct in itself. * * * A determination as to the fact involves investigation of a quite different kind. A public hearing may be regarded as helpful to the ascertainment of misconduct and useless or harmful in finding out the truth as to scholarship." Barnard v. Inhabitants of Shelburne, 216 Mass. 19, 102 N.E. 1095 (1913).

Here, the College was given notice of the charges against it through receipt of the report of the Examining Team. That report, supplemented by the evidence produced by the College itself, contained all the information on which all subsequent decisions were made. No fuller disclosure could have been made. In this aspect, the case of Virgin v. American College of Surgeons, 42 Ill. App.2d 352, 192 N.E.2d 414 (1st Dist., 2d Div. 1963), stands in marked contrast. There specific charges relating to particular medical cases had been made by a person suspected of personal animosity toward the plaintiff. These charges were reduced to writing and submitted to the hearing board, but no copy was ever supplied to the plaintiff. The written charges were used by the board members during the hearing as the foundation for questions addressed to the plaintiff, but a number of the cases were left wholly unmentioned.

Here, no trial-type hearing, with confrontation, cross-examination,

and assistance of counsel would have been suited to the resolution of the issues to be decided. The question was not principally a matter of historical fact, but rather of the application of a standard of quality in a field of recognized expertise. Here there were no witnesses to be called to make particular accusations. The members of the Examining Team were present at the meeting of the Executive Board, available for questioning if needed. Since the Association has no power to summon witnesses or to compel them to testify, to require the full panoply of the procedure of a judicial trial would frequently make it impossible for the Association to act. Cf. People ex rel. Bluett v. Board of Trustees, 10 Ill.App. 2d 207, 134 N.E.2d 635, 58 A.L.R.2d 899 (1956). In any event, there is no right to counsel in hearings conducted by a private association. Green v. Board of Trade, 174 Ill. 585, 51 N.E. 599, 49 L.R.A. 365 (1898).

In its attack on standards, claiming them to be nebulous, the College relies upon decisions holding statutes to be unconstitutional on the ground that they are so vague as to be unintelligible to men of ordinary intelligence. The authority is inapposite. The standards of accreditation are not guides for the layman but for professionals in the field of education. Definiteness may prove, in another view, to be arbitrariness. The Association was entitled to make a conscious choice in favor of flexible standards to accommodate variation in purpose and character among its constituent institutions, and to avoid forcing all into a rigid and uniform mold. No inference of undue vagueness can be drawn from the fact the different committees of equally eminent educators disagreed in their recommendations. Courts have indeed been known to disagree in the application of the Constitution. The critical question for resolution was a matter of degree: whether the College had progressed rapidly enough in correcting its deficiencies.

■ Finally, it is urged that the action of the Association was arbitrary in the substantive sense, without regard to the fairness of the procedure by which it was reached. In this contention, the College questions the adequacy of the reasons given for withdrawing its accreditation. In this field, the courts are traditionally even more hesitant to intervene. The public benefits of accreditation, dispensing information and exposing misrepresentation, would not be enhanced by judicial intrusion. Evaluation by the peers of the college, enabled by experience to make comparative judgments, will best serve the paramount interest in the highest practicable standards in higher education. The price for such benefits is inevitably some injury to those who do not meet the measure, and some risk of conservatism produced by appraisals against a standard of what has already proven valuable in education. The association has achieved its power through the respect it has engendered through its work. If it fails to satisfy its members, they are free to join another group. The controlling principle was laid down by the Court of Appeals for this Circuit in an earlier case where the reasons for denying accreditation by this Association were under judicial attack:

"The Association being purely voluntary is free to fix qualifications for membership; and to provide for termination of membership of institutions which do not meet the standards fixed by the Association. The constitution, by-laws, and rules of government of the Association measure the rights and duties of the members." State of North Dakota v. North Central Association, 99 F.2d at 700 (7th Cir. 1938).

For the foregoing reasons, the motion of the plaintiff for a preliminary injunction is denied. Under the provisions of Rule 52 of the Federal Rules of Civil Procedure, this memorandum embodies the Court's findings of fact and conclusions of law.