MICHAEL R. TREISTER, M.D., Plaintiff-Appellee, *v.* AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, Defendant-Appellant.

First District (3rd Division)   No. 77-1221

Opinion filed October 31, 1979.

SIMON, P. J., dissenting.

Thomas M. Crisham and Nancy E. Ator, both of Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago, for appellant.

Stephen B. Cohen, William J. Stevens, and Joseph Schuman, all of Foss, Schuman & Drake, of Chicago, for appellee.

Miss JUSTICE McGILLICUDDY delivered the opinion of the court:

On November 3, 1976, the plaintiff, Michael R. Treister, M.D., filed a three-count complaint against the defendant, American Academy of Orthopaedic Surgeons, challenging the academy's denial of his initial application for membership in the academy. The academy filed a motion to dismiss plaintiff's complaint on various grounds which included the failure to state a cause of action because the decision of a private professional association rejecting an application for membership is not subject to judicial review. The plaintiff filed a motion to strike the motion to dismiss. On January 24, 1977, the trial court denied the academy's motion to dismiss count I, but granted the motion to dismiss counts II and III.

On January 31, 1977, the plaintiff filed a motion for compelled discovery of all records and correspondence pertaining to Michael R. Treister. The academy responded with a motion to limit discovery. In its

motion the academy contended that discovery should be limited to a determination of the threshold issue as to whether there exists a justiciable matter. In addition, the academy claimed that the plaintiff's application file and the investigative activities contained therein are privileged and confidential and not subject to discovery. On February 18, 1977, after an *in camera* inspection, the trial court entered an order directing the academy to produce the plaintiff's application file.

Subsequently, the plaintiff filed a motion for default judgment stating that the academy refused to produce the application file. The academy filed a motion for summary judgment, a motion to vacate the discovery order of February 18, 1977, on constitutional grounds, and a petition for certification of legal issues for interlocutory appeal. The trial court entered an order denying the three motions. The court granted, in part, the academy's petition for certification but reserved its ruling on the specific orders and issues to be certified.

On August 8, 1977, the court certified the following questions:

"1. Order of January 24, 1977 sustaining Count One of the Complaint and striking Counts Two and Three of plaintiff's complaint. Question: Does plaintiff's complaint state a cause of action, and if so, in which counts?

2. Order of February 18, 1977 granting plaintiff's Motion for compelled discovery and denying defendant's motion for protective order and the order of May 24, 1977 denying defendant's motion to vacate and denying plaintiff's motion for sanctions. Issue: Is the order compelling discovery a proper order?"

The case comes before this court as a permissive interlocutory appeal pursuant to Supreme Court Rule 308. Ill. Rev. Stat. 1977, ch. 110A, par. 308.

Count I of the complaint states that the plaintiff is an orthopaedic surgeon licensed to practice medicine and surgery in the State of Illinois and has been certified by the American Board of Orthopaedic Surgery. The plaintiff is a member of numerous professional associations, holds several teaching positions, is the author of numerous papers relating to the field of medicine and is a member of the attending staff of seven Chicago hospitals.

The plaintiff asserts that the American Academy of Orthopaedic Surgeons, a not-for-profit corporation, admits board-certified orthopaedic surgeons to fellowship and membership in the academy on the basis of standards and rules adopted by the academy and published in their bylaws. The plaintiff claims that active fellowship in the academy is a factor relied upon by hospitals in the granting of orthopaedic surgical privileges, by insurance companies in the establishment of malpractice rates, by courts in determining the expertise of an orthopaedic surgeon

whose testimony is offered as expert and by young physicians selecting a clinic in which to practice. The plaintiff characterizes membership in the academy as "a practical necessity for an orthopaedic surgeon who wishes to realize maximum potential achievement and recognition in his specialty."

In November 1974 the plaintiff applied for membership in the academy by submitting an application form. According to the plaintiff the academy prepared a list of applicants for active fellowship and broadly distributed it to physicians throughout the United States together with a request for information concerning the reputation and qualifications of the persons named thereon.

In 1976 the plaintiff was interviewed by Dr. Louis Kolb, who informed him that there was adverse information in the plaintiff's file. Dr. Kolb predicted that this information would result in the rejection of his application. Although Dr. Kolb informed the plaintiff of the general nature of the charges, the plaintiff asserts that Dr. Kolb did not provide sufficient detail to enable him to rebut the charges. When the plaintiff requested that Dr. Kolb permit him to examine the file, the doctor replied that academy regulations forbade such an examination. Dr. Kolb also denied the plaintiff's request that he further specify the nature of the charges and that he identify the persons making the charges. In addition, Dr. Kolb refused to cite any authority for denying the plaintiff's request to see his file and to be informed of the charges and the identity of his accusers.

The plaintiff states that, at the suggestion of Dr. Kolb, he wrote a letter to the academy attempting to rebut the charges as well as possible under the circumstances and requesting all available appeal rights and the right to be represented by counsel. The plaintiff received no communication from the academy until October 1976, when he received a letter notifying him that his application had been rejected, that the matter was closed and that he could not reapply for admission for three years.

The plaintiff claims that the procedures followed by the academy in rejecting his application violate the academy's bylaws. The bylaws require the regional admissions committee to "conduct a personal interview with the applicant," but the plaintiff was interviewed solely by Dr. Kolb. The bylaws require that the committee "shall make all necessary investigation to verify the credentials of the applicant and determine his qualifications." The plaintiff claims the investigation was insufficient to determine his qualifications because he was not given a fair opportunity to present his case or rebut the charges against him. In addition, the by-laws require every member to abide by the principles of the American Medical Association, one of which states that:

"The basic principles of a fair and objective hearing should always be accorded the physician whose professional conduct is being reviewed. These basic guarantees are: a specific charge, adequate notice of hearing, the opportunity to be present and to hear the evidence, and to present a defense. * * * These principles of fair play apply in all disciplinary hearings and in any other type of hearing in which the physician may be deprived of valuable rights. Whenever physicians sit in judgment on physicians and whenever that judgment affects a physician's reputation, professional status or livelihood, these principles of fair play must be observed. * * *"

The plaintiff charges that these principles were violated because he was not informed of any specific charge, was given no notice or opportunity to be present when his application was to be considered and was not allowed to hear the evidence against him nor to present a defense.

Finally, the plaintiff maintains in his complaint that the bylaws set forth the following conditions precedent to active fellowship:

"1. Active fellowship shall be limited to those individuals who are certified by the American Board of Orthopaedic Surgery and whose medical practice is devoted exclusive to orthopaedic surgery. * * *

2. Active fellows must either be citizens of or in practice in the United States or Canada.

3. Active fellows must be certified by the American Board of Orthopaedic Surgery and must have engaged in the exclusive practice of orthopaedic surgery for a minimum period of three (3) years subsequent to the completion of their period of training.

4. Each applicant must submit an application to the secretary of the academy on forms provided by the academy and the application must be endorsed by two (2) active fellows, or by one (1) active fellow and one (1) emeritus fellow.

5. Election to active fellowship shall be by two-thirds vote of the board of directors.

6. Active fellowship is contingent upon continuing compliance with the articles of incorporation and the by-laws of the corporation.

7. No person shall be elected or remain a fellow of the academy unless he is of good moral character and adheres to the principles of medical ethics of the American Medical Association."

The plaintiff claims that he meets every requirement for active fellowship except for election by two-thirds of the board of directors. The plaintiff, therefore, concludes that the procedure followed by the academy in

rejecting his application was fundamentally unfair and that the rejection is void as a matter of common law.

In his prayer for relief the plaintiff asks for a declaration that he is entitled to be informed of any charges against him; to be informed of the identity of his accusers; to have a fair hearing before an impartial adjudicator, and to have conclusions of fact fairly supported by evidence of record. In addition, the plaintiff asks for a declaration that the rejection of his application was void.

Count II of the plaintiff's complaint re-alleges the allegations contained in count I and further states that "because of the relationship between the academy, the American Medical Association, the hospitals of the State of Illinois, and the State of Illinois itself, rejection of Plaintiff's application is State action." The plaintiff claims, therefore, that the procedure followed by the academy deprived him of his liberty or property without due process of law and seeks the same relief prayed for in count I.

In count III the plaintiff alleges that the academy breached the contract established by the plaintiff's application for membership. The application contained the following provision:

"* * * It is further specifically agreed by the undersigned, that in consideration of the Academy's treatment of the entire contents of this application, as well as all inquiries or investigations made pursuant thereto as privileged and confidential material, and not subject to publication or public dissemination whether voluntary, involuntary or by operation of law, that the undersigned specifically authorizes the Academy to make whatever inquiries and investigation it deems necessary to verify the credentials, professional standing and moral or ethical character of the undersigned. * * *"

The plaintiff claims that the academy breached this agreement and disclosed part of the contents of his application by preparing a list of applicants and broadly distributing the list to physicians throughout the United States. The plaintiff maintains that neither the designation of himself as an applicant nor the distribution of the list was reasonably necessary for the solicitation of information concerning his qualifications or authorized at any time. He contends this constituted a breach of the contractual obligation to guard the confidentiality of his application. The plaintiff asserts that the distribution of the list was not intended to solicit information concerning his qualifications but rather to enhance the power of the academy and, in conjunction with the later publication of a roster of members, to enable the medical community to ascertain what physicians were denied membership. The plaintiff claims that publication

of a roster of members will inform the orthopaedic community of his rejection and will impair his professional reputation and financial situation. The plaintiff seeks an injunction forbidding the publication of the roster of members excluding his name and judgment in the amount of $10,000,000.

## I

The academy argues that the trial court lacked jurisdiction of matters alleged in count I and maintains that the traditional rule is that judicial review is not available to examine a decision by a private professional association to reject an application for initial membership. (See Annot., 89 A.L.R.2d 964, 971 (1963).) The plaintiff contends that in recent years courts have decided that an applicant to professional associations has a right to a fair hearing on his application and to reasonable standards for admission. Because the reviewing courts in Illinois have not considered this issue, we will review decisions of other jurisdictions for assistance in the resolution of this issue.

In 1961 the Supreme Court of New Jersey decided *Falcone v. Middlesex County Medical Society* (1961), 34 N.J. 582, 170 A.2d 791, wherein it affirmed an order of the trial court directing the Middlesex County Medical Society to admit the plaintiff to full membership. The society's rejection of the plaintiff's application was based on an unwritten membership requirement which the court characterized as patently arbitrary and unreasonable.

In *Falcone*, the evidence revealed that the local hospitals required all their staff physicians to be members of the society, and that the society's refusal to admit the plaintiff to membership had serious adverse economic and professional effects on him. The court, in arriving at its decision to permit judicial review as a matter of policy, stated:

> "When courts originally declined to scrutinize admission practices of membership associations they were dealing with social clubs, religious organizations and fraternal associations. Here the policies against judicial intervention were strong and there were no significant countervailing policies. When the courts were later called upon to deal with trade and professional associations exercising virtually monopolistic control, different factors were involved. The intimate personal relationships which pervaded the social, religious and fraternal organizations were hardly in evidence and the individual's opportunity of earning a livelihood and serving society in his chosen trade or profession appeared as the controlling policy consideration. Here there have been persuasive indications * * * that in a case presenting sufficiently compelling factual and policy considerations, judicial relief will be

available to compel admission to membership; * * * ." (34 N.J. 582, 596, 170 A.2d 791, 799.)

Undoubtedly, the court's decision was influenced by the society's virtual monopoly over the use of local hospital facilities and the fact that the plaintiff could not successfully continue his practice of surgery and obstetrics without the use of these facilities.

In *Salter v. New York State Psychological Association* (1964), 14 N.Y.2d 100, 198 N.E.2d 250, the plaintiff, a practicing psychologist, sought a court order to admit him to the association because membership is "a tangible thing of value" to any psychologist. The association responded that the plaintiff failed to meet the educational requirement which is a condition of membership. The New York Court of Appeals interpreted *Falcone* as requiring a showing of "economic necessity" before courts will interfere with the affairs of a private association. In refusing to grant relief to the plaintiff in *Salter*, the court noted that the record revealed no monopoly power over the profession or an arbitrary or unreasonable refusal to grant membership.

The Arizona Supreme Court in *Blende v. Maricopa County Medical Society* (1964), 96 Ariz. 240, 393 P.2d 926, held that the plaintiff's membership application to the society could not be denied arbitrarily if the denial would deprive the plaintiff of hospital staff privileges. The court stated:

"We agree with the reasoning in the Falcone decision. The interests in freedom of association and in autonomy for private associations make it desirable to allow private groups to determine their own membership. But when a medical society controls a doctor's access to hospital facilities, then the society's exercise of a quasigovernmental power is the legitimate object of judicial concern." (96 Ariz. 240, 244, 393 P.2d 926, 929.)

However, in remanding the case to the trial court for hearing, the supreme court advised that if it should determine that the society refused membership on the basis of factual findings supported by substantial evidence and reached through the application of a reasonable standard—one which comports with the legitimate goals of the society and the rights of the individual and the public—then judicial inquiry should end.

In *Pinsker v. Pacific Coast Society of Orthodontists* (1969), 1 Cal. 3d 160, 460 P.2d 495, 81 Cal. Rptr. 623, the plaintiff argued that exclusion from several dental organizations would deprive him of educational, financial and professional advantages. The California Supreme Court held that an applicant for membership has a judicially enforceable right to have his application considered in a manner comporting with the fundamentals of due process, including the showing of cause for rejection. The court stated:

"Because of the unique position in the field of orthodontics occupied by defendant AAO and its constituent organizations, membership therein, although not economically necessary in the strict sense of the word (as was the case in *Falcone*), would appear to be a practical necessity for a dentist who wishes not only to make a good living as an orthodontist but also to realize maximum potential achievement and recognition in such specialty." (1 Cal. 3d 160, 166, 460 P.2d 495, 499, 81 Cal. Rptr. 623, 627.)

The case was remanded to the trial court to permit the defendants to demonstrate the action taken on the plaintiff's application complied with the minimal requisites of a fair procedure required by common law principles.

On remand the defendants presented their reason for denying membership to the plaintiff. However, the plaintiff was not permitted to respond to the charges. The case again reached the State supreme court wherein it held that whenever a private association is legally required to refrain from arbitrary action, the association's action must be both substantively rational and procedurally fair. (*Pinsker v. Pacific Coast Society of Orthodontists* (1974), 12 Cal. 3d 541, 526 P.2d 253, 116 Cal. Rptr. 245.) The court also declared that "fair procedure" requires that before denial of the application, the applicant must be notified of the reason for the proposed rejection and given a fair opportunity to defend' himself.

The plaintiff herein argues that Illinois courts have explicitly approved the modern rule set forth in *Falcone* and *Pinsker* which demands fair procedures and reasonable standards in the processing of membership applications of private associations. The plaintiff discusses two decisions which discuss the expulsion of a member from a private association. In *Virgin v. American College of Surgeons* (1963), 42 Ill. App. 2d 352, 369, 192 N.E.2d 414, the court stated:

"Whether the 'interest of substance' which accrues to a member of a professional association is called a 'property right,' 'contract right' or merely the 'member's relation to the association,' there is a growing awareness that wrongful expulsion from a voluntary professional association has such a serious effect on the ability of the professional man to successfully pursue his livelihood and that it is a judicially protectable interest. [Citations.]

Courts annul expulsions from voluntary associations when they are (1) not in accordance with the constitution and bylaws of the association, (2) influenced by bias, prejudice or lacking in good faith, or (3) contrary to rudimentary due process of natural justice."

In *Van Daele v. Vinci* (1972), 51 Ill. 2d 389, 282 N.E.2d 728, *cert. denied*

*sub nom. Certified Grocers v. Sparkle Food Center, Inc.* (1972), 409 U.S. 1007, the court specified that one subjected to expulsion from a voluntary association should be afforded a hearing before a fair and impartial tribunal.

The plaintiff asserts that because Illinois courts recognize no distinction between expulsion and exclusion, the law in those cases dealing with expulsion is applicable to cases involving the exclusion of an applicant from a private association.

We disagree with the plaintiff's contention that Illinois courts use the words "expulsion" and "exclusion" interchangeably. A review of the decisions concerning the expulsion or exclusion of a doctor from a private hospital's staff supports our position. Although Illinois courts will require a hospital to follow its bylaws in revoking a physician's staff privileges (*Nagib v. St. Therese Hospital, Inc.* (1976), 41 Ill. App. 3d 970, 355 N.E.2d 211), they will not review the denial of an application for appointment to the medical staff. *Jain v. Northwest Community Hospital* (1978), 67 Ill. App. 3d 420, 385 N.E.2d 108; *Mauer v. Highland Park Hospital Foundation* (1967), 90 Ill. App. 2d 409, 232 N.E.2d 776.

In determining whether we should permit judicial review of the denial of the plaintiff's membership application, we must weigh the importance of two values which are in conflict in this situation. On the one hand, we recognize the necessity of judicial restraint from interfering with or regulating the affairs and decisions of a private, voluntary association. However, we also find it unconscionable that a private association could deprive an individual of the right to pursue his or her profession because of a personality conflict, his or her race or religion, or, as the plaintiff suggests in his brief, testimony on behalf of plaintiffs in malpractice actions.

■■ ■ Balancing these two interests, we hold that our courts can review the application procedures of a private association when membership in the organization is an economic necessity. We approve of the opinions in *Falcone* and *Blende* which hold that a medical society cannot arbitrarily deny membership to an applicant when the society controls access to local hospital facilities and thus can deprive the applicant of his ability to practice medicine.

■■ We find, however, that the plaintiff has not alleged that membership in the American Academy of Orthopaedic Surgeons is an economic necessity. Membership is not a requisite to hospital staff privileges as evidenced by the fact that the plaintiff is a member of the attending staff at seven Chicago hospitals. In addition, the plaintiff was board-certified and licensed by the State without academy membership.

The plaintiff's complaint alleges that membership in the academy is a "practical necessity * * * to realize maximum potential achievement and

recognition in his specialty," language used by the California Supreme Court in *Pinsker*. We refrain from following *Pinsker*, however, because such a holding would result in complaints for judicial review of every application rejection by a voluntary association since membership in most organizations results in some professional or economic benefits. (See *Blatt v. University of Southern California* (1970), 5 Cal. App. 3d 935, 85 Cal. Rptr. 601 (plaintiff sought to compel membership in the Order of the Coif, a national honorary legal society).) An examination of court opinions rendered subsequent to *Pinsker* reveals the extent to which California courts have reviewed the admission procedures of private organizations. *Marin County Board of Realtors, Inc. v. Palsson* (1976), 16 Cal. 3d 920, 130 Cal. Rptr. 1, 549 P.2d 833 (review of exclusion from association of real estate brokers); *Ascherman v. St. Francis Memorial Hospital* (1975), 45 Cal. App. 3d 507, 119 Cal. Rptr. 507 (review of exclusion from hospital staff despite the fact that the physician enjoyed full staff privileges of four other hospitals and made no showing of a significant injury to his medical practice).

Although in this case we sympathize with the plaintiff's frustration with the academy's refusal to give him the courtesy of an explanation of the denial of his application, we believe the courts must refrain from interfering in the affairs of a private association absent a showing of economic necessity.

■ The plaintiff also asserts in count I that he has a right to have his application considered according to the bylaws of the academy. Although our courts will require an association to follow its bylaws in expelling a member (*Virgin v. American College of Surgeons*), we find no Illinois case law which permits a nonmember to seek judicial enforcement of an association's bylaws.

In addition, the plaintiff argues that he has a contractual right to have his application considered according to the bylaws. The plaintiff relies on a provision in his application which states:

> "The undersigned agrees that he will comply with each and every provision of the by-laws of the American Academy of Orthopaedic Surgeons and any duly adopted rules and regulations pursuant thereto; and that he will comply with the Principles of Medical Ethics of the American Medical Association."

The plaintiff argues that because he is required to abide by the bylaws, it is implicit in this provision that the academy must obey the bylaws as well.

This provision, however, binds the plaintiff to comply with the academy's bylaws in the future should his application for membership be accepted. The provision places no duty upon the academy to employ certain criteria in evaluating applications for membership.

For the foregoing reasons, we hold that count I of the plaintiff's complaint states no cause of action.

## II

The trial court dismissed for failure to state a cause of action count II of the complaint which alleged that the procedure followed by the academy deprived the plaintiff of his liberty or property without due process of law. Count II realleged the allegations contained in count I and added the following paragraph:

"Because of the relationship between the academy, the American Medical Association, the hospitals of the State of Illinois, and the State of Illinois itself, rejection of Plaintiff's application is State action."

The plaintiff claims that the question of State action is one of fact which should rarely be decided on a motion to dismiss. The academy labels this count "wholly conclusory" and states that the count alleges no facts which would establish State action.

■■ Our Civil Practice Act states that pleadings are to be liberally construed with a view to doing substantial justice between the parties. (Ill. Rev. Stat. 1975, ch. 110, par. 33.) Therefore, when a trial court rules on a motion to dismiss a complaint for failure to state a cause of action, all facts properly pleaded and all reasonable inferences therefrom must be taken as true. (*Newby v. Board of Education* (1977), 53 Ill. App. 3d 835, 368 N.E.2d 1306.) However, a complaint which does not allege sufficient facts to demonstrate a cause of action may not be remedied by liberal construction. (*First National Bank v. City of Aurora* (1978), 71 Ill. 2d 1, 373 N.E.2d 1326; *Founding Church of Scientology v. American Medical Association* (1978), 60 Ill. App. 3d 586, 377 N.E.2d 158.) The complaint may not rest upon conclusions of fact unsupported by allegations of specific facts from which such conclusions may be drawn. *Henkhaus v. Barton* (1977), 56 Ill. App. 3d 767, 371 N.E.2d 1166.

■■ The plaintiff asserts that because of the relationship between the academy, the American Medical Association, the hospitals of this State, and the State itself, his rejection from the academy is State action. This statement is merely a conclusion unsupported by any allegations of fact. The plaintiff makes no attempt to explain the relationship which would support a conclusion of State action. Absent sufficient factual allegations, the plaintiff's conclusory charge of State action is insufficient to withstand a motion to dismiss. The trial court properly dismissed count II of the plaintiff's complaint.

The academy also argues that the propriety of the trial court's order dismissing counts II and III is not properly before this court pursuant to Supreme Court Rule 308. It states that neither its petition for certification

of legal issues for interlocutory appeal filed in the trial court nor its application for leave to appeal on file with this court requested certification of the issues raised by the trial court's dismissal of counts II and III.

Rule 308(a) provides that:

> "When the trial court, in making an interlocutory order not otherwise appealable, finds that the order involves a question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, the court shall so state in writing, identifying the question of law involved. Such a statement may be made at the time of the entry of the order or thereafter on the court's own motion or on motion of any party. The Appellate Court may thereupon in its discretion allow an appeal from the order." (58 Ill. 2d R.308(a).)

This rule specifically permits the trial court to certify an order on its own motion. The trial court's order of certification explicitly requested that this court determine if the complaint stated a cause of action and, if so, in which counts. In our opinion the sufficiency of counts II and III is clearly before this court.

### III

The trial court also dismissed for failure to state a cause of action count III of the complaint which alleged that the academy breached the contract established by the plaintiff's application for membership. That provision stated that in consideration of the academy's treatment of the contents of the application as well as all inquiries or investigations made pursuant thereto as privileged and confidential, the applicant authorized the academy *"to make whatever inquiries and investigations it deems necessary* to verify the credentials, professional standing and moral or ethical character of the undersigned." (Emphasis added.) The plaintiff alleges that the academy breached this contract by distributing a list of applicants to physicians throughout the United States.

As a matter of law, we find that the plaintiff has alleged no facts to support his claim of breach of contract which would withstand a motion to dismiss. The academy's circulation of the list of applicants to its members definitely is a reasonable means of investigation which the plaintiff authorized in the application. Disclosure of the name of an applicant is clearly contemplated by the terms of the agreement, and it is inherent in the very notion of applying for membership in any selective organization. We agree with the trial court that count III of the plaintiff's complaint does not state a cause of action.

Because we have determined that the plaintiff's complaint does not

state a cause of action, it is unnecessary for us to consider whether the order compelling discovery was a proper order.

For the foregoing reasons, that portion of the order of the Circuit Court of Cook County sustaining count I of the plaintiff's complaint is reversed and count I is dismissed; that portion of the order of the Circuit Court of Cook County dismissing counts II and III is affirmed.

Affirmed in part; reversed in part.

RIZZI, J., concurs.

Mr. PRESIDING JUSTICE SIMON, dissenting:

Dr. Treister is entitled to more from this court than sympathy.

He seeks admission to a prestigious medical society, not to a social, religious, or fraternal organization like an Elks Club (see *Zelenka v. Benevolent & Protective Order of Elks* (App. Div. 1974), 129 N.J. Super. 379, 324 A.2d 35) or the Order of the Eastern Star (see *Trautwein v. Harbourt* (App. Div. 1956), 40 N.J. Super. 247, 123 A.2d 30). He is entitled to be treated as if he were applying for membership in the Pacific Coast Society of Orthodontists (see *Pinsker v. Pacific Coast Society of Orthodontists* (1969), 1 Cal. 3d 160, 460 P.2d 495, 81 Cal. Rptr. 623, and (1974), 12 Cal. 3d 541, 526 P.2d 253, 116 Cal. Rptr. 245) or the Middlesex County Medical Society (see *Falcone v. Middlesex County Medical Society* (1961), 34 N.J. 582, 170 A.2d 791; accord, *Blende v. Maricopa County Medical Society* (1964), 96 Ariz. 240, 393 P.2d 926).

The majority opinion appears to accept this at least in part when it approves "of the opinions in *Falcone* and *Blende* which hold that a medical society cannot arbitrarily deny membership to an applicant when the society controls access to local hospital facilities and thus can deprive the applicant of his ability to practice medicine." The majority, however, balancing the interests, frames a test of "strict economic necessity." It holds that because Dr. Treister could not in good faith allege that exclusion from the Academy would preclude him from practicing orthopaedic surgery, the law is unable to assist him. Except perhaps for *Pima County Medical Society v. Felland* (Ariz. App. 1977), 115 Ariz. 311, 565 P.2d 188, I have found no reviewing court opinion which applies *Falcone* so restrictively. Compare *Salter v. New York State Psychological Association* (1964), 14 N.Y.2d 100, 198 N.E.2d 250.

I believe the majority understates Dr. Treister's interest. At the same time, it overestimates the Academy's legitimate interests, and by focusing on the effects of exclusion on Dr. Treister personally, obscures an essential aspect of this case, the nature of the Academy. The public interest at stake is also slighted. As a result, the majority opinion is

needlessly reluctant about intervening in the affairs of quasi-public entities.

Part I of this dissent analyzes Illinois law which, contrary to the majority's view, I believe supports Dr. Treister's complaint. Part II analyzes the interests of the Academy, Dr. Treister and the public and demonstrates that fairness and public need favor Dr. Treister. In Part III my views on the broader public policy issues which surface in this case are set forth.

I.

Dr. Treister has stated a cause of action under Illinois law which I believe the majority misapplies. In *Van Daele v. Vinci* (1972), 51 Ill. 2d 389, 282 N.E.2d 728, the supreme court considered the plaintiff's expulsion from a cooperative buying association, and said:

"[T]his strong possibility that an *important economic interest* of the plaintiffs was affected by an improper administrative proceeding gives the court power and the duty to act. We agree with the view expressed by the Supreme Court of New Jersey that said: 'We are here concerned with and therefore deal solely with an organization, membership in which may here * * * be viewed as an economic necessity; in dealing with such an organization, the court must be peculiarly alert to the need for truly protecting the public welfare and advancing the interests of justice by reasonably safeguarding the individual's opportunity for earning a livelihood while not impairing the proper standards and objective of the organization. [Citation.]' [*Falcone.*]

* * * To hold otherwise would be a denial of essential rights. We agree 'that a private organization, particularly if tinged with public stature or purpose, may not expel or discipline a member adversely affecting substantial property, contract or other economic rights, except as a result of fair proceedings which may be provided for in organization by-laws, carried forward in an atmosphere of good faith and fair play.' [Citation.] The rationale for this position * * * results from the character of the organization, *i.e.* its assumption of a purpose which exceeds merely that of a social organization and its endeavor to benefit from various State and Federal laws." (Emphasis added.) 51 Ill. 2d 389, 394-95.

Both the facts and the language of *Van Daele* show that "economic necessity" is not, in this State, the towering hurdle the majority erects. Membership in Certified Grocers was less vital than membership in the Academy, for, although large, Certified Grocers was not a monopoly. And "an important economic interest" sounds more like the *Pinsker*

court's "substantial economic advantages" (1 Cal. 3d 160, 165, 460 P.2d 495, 498, 81 Cal. Rptr. 623, 626) than like the majority's standard. Indeed, *Falcone* itself might not pass the majority's test: The Middlesex County Medical Society, after all, could interfere with a physician's practice only in a limited geographic area. It is not clear to me why membership is any more necessary when its absence bars practice entirely, but only in a small area, than when the effect is less fatal but also continent wide.

The majority dismisses *Van Daele* as being a case of expulsion as opposed to exclusion. I do not see that that opinion anywhere turns on this distinction; and I do not think an opinion that expressly agrees with the theory of *Falcone*, an exclusion case, should be read to be limited to expulsion cases, when it neither mentions any such distinction nor is readily susceptible to it. The reasoning of *Van Daele*, as I read it, applies equally to expulsion and exclusion.

Of course, membership in an organization confers rights not enjoyed by nonmembers; but members and nonmembers also have certain rights in common. The courts will at times review expulsions from organizations from which exclusion would be unreviewable. Partly this may be explainable on a theory of contract rights; and partly it derives from the fact that in the context of many, perhaps most, associations, expulsion is a greater harm than exclusion. Expulsion is often more degrading, since it is only done for grave offenses, while people are rejected for membership every day for all sorts of reasons, many of them not personally shameful. And while someone excluded from one organization can try the next, an expelled member loses what may be a heavy investment in the organization, in time, money, and social effort. In effect, each organization is a little monopoly to its members. But this willingness to review expulsion cases was well established in the law long before *Van Daele*. The *Van Daele* court chose to ignore this body of law, and instead to rely upon ideas developed in New Jersey in an exclusion case. Perhaps this was because the special harm caused by expulsion was not prominent on the facts of the case, and the plaintiff was seeking more than compliance with the bylaws, the usual expulsion demand; *Van Daele* was really more like the typical exclusion than the typical expulsion case. Whatever the court's reasons for taking this path, to me it is clear that there are now in Illinois two theories upon which courts may review association actions; one is limited to expulsion cases, the other is not; *Van Daele* dealt with the second strand, and so, although it was itself a case of expulsion, its doctrine applies equally to exclusion.

In large, powerful, not-very-personal organizations such as the Academy, there is not much difference, realistically, between exclusion and expulsion. When every first-class orthopaedic surgeon is expected to join the Academy, and those who are interested in such things not only

look for that membership but may expressly ask about rejections, the difference between rejection and expulsion is slight. And Dr. Treister needs no "investment" in membership to make him favor the Academy over its competitors for the Academy, being a full-grown national monopoly has none. Dr. Treister's "investment" was the study and practice that produce an experienced orthopaedic surgeon. Thus, the nature of the association in *Falcone*-type cases takes the place of membership. Even on the contractual approach to membership rights, *Falcone*-type associations have a special character that substitutes for the contract: the Academy is akin to a common carrier, in that it holds itself out as accepting all suitable comers, and so induces reliance upon anticipated acceptance, and discourages the formation of competing associations.

The expulsion cases and the *Falcone* theory are not entirely separate: they address common concerns in similar situations. The expulsion cases do not rest upon any magic in membership, but upon concerns recognizable in the present case. For example, in *Virgin v. American College of Surgeons* (1963), 42 Ill. App. 2d 352, 192 N.E.2d 414, the court explained:

> " 'Some associations have a stranglehold upon their members through their control of an occupation * * * which can ill be spared. * * *'
>
> * * *
>
> "[W]rongful expulsion from a voluntary professional association has * * * a serious effect on the ability of the professional man to successfully pursue his livelihood and * * * it is a judicially protectable interest." (42 Ill. App. 2d 352, 368-69.)

There may be merit in distinguishing expulsion and exclusion in the routine hospital cases the majority cites. But hospital cases do not justify separating exclusion from expulsion in logic-tight compartments, and contorting supreme court precedent. I believe *Van Daele*'s standards control this case.

One might argue that *Van Daele* was special, in that the expulsion there was allegedly in retaliation for the plaintiff's lawsuit against the directors of the association, *i.e.*, that the court was really concerned about protecting the judicial process. But this case raises the same concern: Dr. Treister has suggested that the real reason for his exclusion is that he has on occasion testified in court against other doctors.

## II.

Apart from any established law, I believe that logically the majority's strict economic necessity test is too stringent, and that count I of the complaint should be sustained. The Academy is not simply a private

body, accepting and rejecting applicants according to its private needs and desires. It would no doubt deny indignantly that it exists primarily to fatten its members' wallets and egos. Rather, it aspires to a more exalted function, as guardian of the profession and of the public generally. It purports to be judicious rather than exclusive. The Academy holds itself out as the sole legitimate organization of its kind in the profession, and is widely recognized as such. It is a monopoly; and it is affiliated with the A.M.A., itself a monopoly, and no doubt with many local groups. No one who chooses (and, unsuspecting, trains, and practices) to become an orthopaedic surgeon in the United States or Canada can escape its jurisdiction. Indirectly, therefore, the public health is at stake. The power of such an association, tinged with a public stature or purpose (*Van Daele*, 51 Ill. 2d 389, 395), almost a private, specialized government, should not be unbridled, but should be viewed judicially as a fiduciary power to be exercised in a reasonable and lawful manner (*Pinsker*, 1 Cal. 3d 160, 165, quoting *Falcone*).

The majority underrates the Academy's capacity to harm Dr. Treister. It is true that he has so far done quite well without Academy membership; but that is because until recently his inexperience has made him obviously unripe for membership, so that his nonmembership has been perceived as routine, temporary, and insignificant. From now on, things will be different. Count I of the complaint alleges that hospitals and insurance companies rely on Academy membership. Some of these institutions require disclosure of membership status in professional organizations like the Academy, and, in addition, specifically require disclosure of rejections from such organizations. Hospitals, insurance companies, and others know that almost all Board-certified orthopaedic surgeons become members of the Academy two years after Board certification. A questionnaire or application form filled out by an orthopaedic surgeon who has not been admitted to Academy membership two years after this certification raises serious questions and can substantially impair the practitioner's career.

The revelation that Dr. Treister has been rejected by the Academy is going to "red-flag" every application for staff privileges or insurance that he will ever make, subjecting him to close scrutiny, and making every one of his applications a major event when it would otherwise be approved as a matter of routine. Particularly because Dr. Treister is known to meet every formal requirement for Academy membership, hospitals and insurers can logically conclude that he must have been excluded for incompetence or unethical conduct. It will be difficult for Dr. Treister to rebut this inference with the facts, since the Academy refuses to particularize any accusation.

Also, it is well known that medical malpractice insurance rates have

rocketed and are now a large part of the cost of practice. Although Dr. Treister is now considered a prime risk, paying the lowest rate, his premium is almost $20,000 per year. Even a modest percentage surcharge is substantial.

The more subtle effects of rejection could prove even more crippling. The emerging pattern of medical care distinguishes between internists, who have a stable patient pool, and other specialists, who rely on referrals. Because a single patient is likely to see an orthopaedic surgeon only rarely over the course of a lifetime, while he might see an internist many times, the surgeon is peculiarly dependent on referrals. Referring doctors often use Academy membership to verify their impression of specialists, and may even find a doctor for a referral by examining the Academy membership list. New associates, necessary for the growth of a medical practice, also rely on Academy membership in evaluating an orthopaedic surgeon who seeks to employ them. Finally, many attorneys prefer Academy members as expert witnesses.

The fact that Dr. Treister has hospital privileges does not mean that he is not in trouble. Even if these hospitals know him well enough that they will never in the future be influenced by the Academy to deny him those privileges, a lack of hospital facilities is hardly the only peril to a medical career. Also, Dr. Treister may some day desire privileges at new hospitals, which will be influenced by his rejection.

The majority's fear that there will be no way to draw the line if we allow relief to Dr. Treister is therefore unfounded. Membership in the Academy is distinctly more than "a tangible thing of value" (*Salter v. New York State Psychological Association* (1964), 14 N.Y.2d 100, 103, 198 N.E.2d 250, 251), and offers more than "educational, professional or financial advantage" (*Blatt v. University of Southern California* (1970), 5 Cal. App. 3d 935, 939, 85 Cal. Rptr. 601, 604); and the fact that the *Blatt* court did hold for the Order of the Coif in California under the *Pinsker* standard shows that distinctions can be made. Of course there will be more cases until the law is firmly settled; but that is a commonplace of the common law method. We have here a spectrum of possible organizations and articulable standards, and the fact that one end of the continuum is unsuitable for judicial review is simply no reason for the courts to take refuge at the extreme other end. The law should defend us from wrongs without demanding ruin and starvation.

On the other side of the balance, the Academy's legitimate interest is lighter than the majority supposes. It is important to note how modest is Dr. Treister's prayer for relief. He does not seek to compel the Academy to admit him to membership. He asks only that it consider his application fairly, in accordance with its own bylaws and the principles of ethics

established by the Academy's affiliate the A.M.A.—a set of principles the Academy requires every member to adhere to. There should be nothing directly offensive to the Academy about doing in fact what it publicly professes to do.

The Academy is neither a social nor an operating body. It does not select members for their ability to carry out the corporate function; the members have little direct effect upon the organization or each other. The Academy is not going to fall apart by accepting someone it should not; certainly it would not be legally liable for his ineptitude, as a hospital may be for its doctors, or an employer for its servants. Rather, the Academy functions largely as an informal accrediting body. It does offer its members some direct benefits, such as the opportunity to present papers on medical topics to the other members (and Dr. Treister has duly alleged harm from his inability to obtain these benefits); but the main advantage of membership appears to be the credential, the Academy's endorsement, relied on by others. This reliance, and therefore the value of Academy membership, depend on a general perception that the Academy is fair and accurate and follows its published standards, so that people can know and trust what they are getting when they treat membership as an indicator of professional quality. Thus, Dr. Treister is only asking that the Academy perform properly its most prominent function, and thereby maintain honestly the reputation on which its prestige is founded.

The Academy does have an interest in holding itself aloof from judicial supervision. Obviously, it would not like the prospect of having to accept someone it does not really want but cannot justify rejecting. If the Academy's reservations are vindicated by the unwelcome members' subsequent behavior, the Academy's reputation and power will suffer from their scandals. And such a body may believe that it can discriminate among applicants more accurately if no one looks over its shoulder, and it is unrestricted in its methods. Indeed, apart from the Academy's interests, and purely as a matter of the public good, fallible judges may well hesitate to interfere with a group so successful; its high status might be taken to indicate that its methods and judgment have proven best. This judicial modesty is commendable; but taken too seriously it would naturally lead to refusals to look at the practices even of *public* entities— which is not the law (*Mauer v. Highland Park Hospital Foundation* (1967), 90 Ill. App. 2d 409, 413, 232 N.E.2d 776).

I suggest, moreover, that both the inference of excellence and the legitimacy of the organization's demand for autarchy are impeached where the organization is so strong that membership is a practical necessity for the attainment of eminence in the profession. The reason is that such an association's rejections become self-fulfilling prophecies, not

to be proven wrong by events. The association's outcast will not return one day in glory to embarrass them, for his rejection itself dooms him to obscurity.

An ordinary organization, a hospital, say, or a university, however prestigious, must learn to appreciate the best people, for its future reputation and success depend on achievement. A hospital that capriciously spurns fine doctors will not only see the excellence demonstrated by some of its rejectees pointed to as glaring evidence of its foolishness, but will endanger the quality of its services. The effects will be visible in comparison with neighboring, fairer hospitals.

The Academy, in contrast, will hardly be blamed if American orthopaedic surgical skills are not as high as they might be. Probably, nobody will even notice a problem, because the Academy's monopoly prevents comparisons.

The result is that an association, once it attains such influence as the Academy has, can maintain it long after it ceases to deserve its position. The Academy, if left to its own devices, can well afford to reject qualified applicants as it pleases. Its officers can indulge their prejudices and ulterior motives. The Academy has also an incentive to be overly cautious and bland, since while those erroneously rejected will pale into general practice, members who turn out badly, or are merely abrasive, will be noticed, and in quantity could eventually harm the Academy's reputation.

The Academy can do these things, but only secretly: it cannot afford to be known to behave this way. For if those who rely on Academy membership as a mark of skill and ethicality were to discover that the Academy does not after all give them fair and unbiased evaluations, they might stop depending so heavily on the Academy.

The secrecy in which such associations have historically cloaked themselves is therefore little proof if its value for legitimate purposes, and is open to sustained abuse. By keeping Dr. Treister ignorant of the reasons for his rejection, the Academy prevents him from effectively impugning its decision. In a battle without specifics, Dr. Treister's credibility against the Academy's, everyone except Dr. Treister's intimates will naturally believe the Academy, which can thus do as it will without fear of exposure. Unless the courts intervene to open the process up, such associations may maintain indefinitely a fraud on the public. The public interest in preventing such practices must be weighed in the law's scale.

I do not by this discussion mean to accuse the Academy, or any such group, of actually engaging in such conduct. Dr. Treister has not alleged it, and judicial review should not turn upon an almost impossible preliminary showing of a pattern of impropriety. I have been discussing possibilities and temptations, not facts. The Academy is mentioned simply because it is before us. My point is that the power of groups like

the Academy is so great, so self-perpetuating, so little checked by private forces, and has such potential for abuse, that the balance of interests favors judicial oversight. Every orthopaedic surgeon desperately needs the Academy's favor; he is at its mercy; yet he has nothing to offer it; the Academy has no use for anyone in particular, though it professes to welcome all who deserve it. The Academy is more like a government than like a truly voluntary combination, and may justly be treated accordingly.

The distinction between groups which do or do not have this character is dramatic enough that it would be possible to hold a firm legal line between them. It would not be too much harder than trying to descry, without any underlying theory, the boundary between expulsion and exclusion. Try, for example, to classify a failure to renew a membership, or a decision to enforce universally a rule from which someone had previously held a special exemption (*Fahey v. Holy Family Hospital* (1975), 32 Ill. App. 3d 537, 336 N.E.2d 309).

In summary, the balance-the-interests approach easily lends itself, upon scrutiny of the interests, to a "practical necessity" formulation reminiscent of *Pinsker*.

### III.

I myself would not choose to make these distinctions I have been discussing, for I find the theory expounded in Part II too narrow. For me, this is an easy case. I oppose arbitrary or unfair exclusion from any organization; and I would accept cases concerning any group with enough power to influence society in a significant way and to affect seriously an applicant's career. See my dissent in *Davis v. Attic Club* (1977), 56 Ill. App. 3d 58, 371 N.E.2d 903.

The Academy's unjust rejection of applicants, resulting from unfair admissions standards and procedures, could have pernicious effects on society. The rejection of qualified applicants injures the public—whom, after all, physicians are licensed to serve—by disabling physicians who might otherwise have been able to perform great public service. Also, applicants who were accepted for membership according to unfair procedures based on arbitrary or biased standards might advance to positions of trust and importance they otherwise would not attain—and for which they were not qualified. Thus, the public has a strong and often-ignored stake in the membership practices of such societies. A professional society that uses its membership policies in the following ways does the public a grave disservice: (i) to enforce a "conspiracy of silence" by excluding doctors who truthfully testify against other members of their professions in instances of malpractice (*Ascherman v. St. Francis Memorial Hospital* (1975), 45 Cal. App. 3d 507, 119 Cal. Rptr. 507); (ii) to unreasonably exclude physicians who criticize sacred cows of

the profession, thereby stifling creative thought and constructive criticism (*Sussman v. Overlook Hospital Association* (App. Div. 1967), 95 N.J. Super. 418, 231 A.2d 389); or (iii) to deny membership privileges to doctors because of their race, etc. In fact, a professional society using admission and rejection to produce such results betrays the trust of a public it exists to benefit. And it abuses the power it has acquired, advancing some to positions they do not merit, and retarding other, more worthy, orthopaedic surgeons. I find it unconscionable that an association might engage in such conduct, even if it does not thereby succeed in driving the victims entirely out of the profession.

I believe that the proper test is not a showing of "economic impotency," as the Academy contends and the majority holds, but rather whether exclusion would "effectively impair the physician's right to fully practice his profession" (*Ascherman v. St. Francis Memorial Hospital* (1975), 45 Cal. App. 3d 507, 511, 119 Cal. Rptr. 507, 509) and attain the highest eminence and respect in that profession that his talent and character will permit.

As, however, it is apparent that many of my colleagues do not share my views on these broader issues, I have set out in part II an argument for a compromise position more compatible with the majority's philosophy, and yet adequate to grant relief to Dr. Treister.

I believe Dr. Treister is entitled to a fair hearing on the application, to be judged by standards reasonably related to the Academy's purposes, and to be informed of the reasons for his rejection. I would affirm the circuit court's order sustaining count I of the complaint and permit Dr. Treister to have a trial on the merits of that count after proper discovery has taken place.

## IV.

So far as count II of the complaint is concerned, I agree with the majority that the allegation regarding the relationship between the Academy, the American Medical Association, the hospitals of the State of Illinois, and the State of Illinois itself is so sparse that the court can do no more than guess at what Dr. Treister's complaint in this respect actually is. I agree with the majority that this is only a conclusory charge, inadequate to sustain a claim of State action or anything else.

Count III of the complaint is based on a claim of breach of contract. It properly alleges a contract between Dr. Treister and the Academy in connection with the application he was making and how it was to be treated. (See *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 371 N.E.2d 634.) In holding, as it does, that circulating names of membership applicants to Academy members was a reasonable means of investigation which the plaintiff himself authorized, the majority reads

into the agreement provisions I do not find in it. Whether the dissemination of plaintiff's name and the fact that he had applied for membership was reasonably necessary to verify his credentials, professional standing, and moral or ethical character, or was inconsistent with the Academy's promise to treat the contents of Dr. Treister's application as privileged and confidential, is a matter for evidence and trial.

It would be more sensible to read into the contract a promise by the Academy to consider the application fairly and according to the bylaws. (*Steinberg.*) This is yet another ground for granting the plaintiff relief.

I would remand this case for full discovery and for trial on counts I and III.