977 F.2d 585
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
R. Anthony MARRESE, M.D., Plaintiff-Appellant,
v.
AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, Defendant-Appellee.
 Nos. 91-1366, 91-1508.
 United States Court of Appeals, Seventh Circuit.
 Argued May 18, 1992.
Decided Oct. 1, 1992.
 
 1
 Before CUDAHY and MANION, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge*.
 
 ORDER
 
 2
 This antitrust suit, alleging that the American Academy of Orthopaedic Surgeons (the Academy) violated § 1 of the Sherman Act, is one of several lawsuits filed in both state and federal court by R. Anthony Marrese, M.D., concerning the Academy's decision to reject his application for membership and the subsequent loss of his privileges to practice at Deaconess Hospital in Evansville, Indiana. See, as well as the various opinions in this case, Treister v. American Academy of Orthopaedic Surgeons, 78 Ill.App.3d 746, 396 N.E.2d 1225, 1232 (1979) (claim alleging violation of associational rights guaranteed by state law); Marrese v. Interqual, Inc., 748 F.2d 373 (7th Cir.1984) (antitrust challenge to peer review procedures at Deaconess Hospital), cert. denied, 472 U.S. 1027 (1985); Marrese v. Deaconess Hospital, No. 90-3415 (7th Cir. June 1, 1992) (state law challenge to Deaconess Hospital's peer review procedure). This case itself has had a rather remarkable history. Filed in 1980, this case came before us in 1984. At that time, we decided as a matter of federal law that the decision in Treister was res judicata and barred Marrese's antitrust claim. Marrese v. American Academy of Orthopaedic Surgeons, 726 F.2d 1150 (7th Cir.1984) (en banc). The Supreme Court, however, reversed our decision, holding that state law, not federal law, controlled Treister's preclusive effect. Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985). On remand, the district court determined that Illinois law did not bar Marrese's antitrust suit, and allowed the suit to go forward. Marrese v. American Academy of Orthopaedic Surgeons, 628 F.Supp. 918 (N.D.Ill.1986).
 
 
 3
 After more motions and discovery, the Academy filed a summary judgment motion which the district court granted. Presently before us is Marrese's appeal from that decision. Because we agree with the district court that Marrese has not demonstrated a genuine issue of material fact about whether the Academy violated § 1 of the Sherman Act, we affirm.
 
 I.
 
 4
 Before proceeding further, we should note the state of the voluminous record in this case. At several isolated points in his opening brief, Marrese complains that the district court did not allow adequate discovery and (if we are construing these references correctly) that the additional discovery he sought would have clarified that material factual issues do exist in this case. We agree with the Academy that Marrese has waived any challenge to the district court's discovery decisions. Marrese's opening brief contains only scattered references to his discovery problems, with no citations to authority or the record. Marrese's opening brief does not develop these scattered references into a coherent argument. See Fed.R.App.P. 28(a)(4) (argument shall contain appellant's contentions and reasoning, with citation to the record and authority). As we have held many times, such cursory and undeveloped arguments do not preserve an issue for appeal. See, e.g., United States v. Petitjean, 883 F.2d 1341, 1349 (7th Cir.1989); Ordower v. Feldman, 826 F.2d 1569, 1576 (7th Cir.1987).
 
 
 5
 Marrese does make a better attempt at developing his discovery argument in his reply brief, but that is too late. Egert v. Connecticut General Life Ins. Co., 900 F.2d 1032, 1035 (7th Cir.1990). In any event, Marrese has not included in his appendix any of the district court's orders or opinions on discovery despite Circuit Rule 30(b)(1), which requires that the appellant include "[c]opies of any ... opinions or orders in the case that address the issues sought to be raised," and despite Marrese's counsel's statement that he has included all required materials in his appendix. It is difficult, if not impossible, to review a district court's decision, especially a discretionary decision, without knowing the court's reasoning. Rule 30(b)(1) is meant to ensure that we have that reasoning before us. Because of his failure to properly present or argue any discovery issues, Marrese must rely on the record as it now stands.
 
 
 6
 For present purposes, a brief overview of this litigation and Marrese's allegations will suffice in summarizing the facts. Marrese emphasizes that he graduated first in his medical school class at Loyola University while at the same time earning an advanced degree in physiology, magna cum laude. In the early 1970's, after completing his residency requirement and passing his board examinations, Marrese set up practice as an orthopaedic surgeon in Evansville, Indiana. Although Marrese performed all types of orthopaedic surgery, he specialized in spinal surgery.
 
 
 7
 In 1975, Marrese applied for membership in the Academy. In 1976, the Academy's Board of Directors deferred his application for one year, and in October 1977, the Board rejected his application without telling him why or allowing him to appeal. During the application process, the Academy solicited and received comments from other orthopaedic surgeons who knew Marrese, including several orthopaedic surgeons who competed with Marrese in Evansville. Marrese subsequently filed a second application, which the Academy has not yet acted on.
 
 
 8
 Marrese was a successful orthopaedic surgeon and a vigorous competitor, a fact, he says, that did not sit well with other orthopaedic surgeons in Evansville. According to Marrese, his ability to compete successfully prompted Evansville Academy members to oppose his application for membership and to write derogatory letters to the Academy. He also contends that the anti-competitive animus of other Evansville area doctors led to a peer review and eventual loss of his practice privileges at Deaconess Hospital.[1] Marrese contends that the loss of his privileges at Deaconess drove him out of the market for spinal orthopaedic surgery in Evansville and the immediately surrounding area.
 
 
 9
 Marrese's theory of antitrust violation appears to be as follows. When Marrese went to Evansville, a "gentleman's agreement" existed between neurosurgeons and orthopaedic surgeons. According to that agreement, reconstructive surgery of the spine was to be performed by two surgeons: a neurosurgeon would perform any disc surgery, and an orthopaedic surgeon would perform spinal fusion. Each surgeon charged a separate fee, driving up the cost of the surgery to the patient. Marrese, who was qualified to perform both procedures, refused to abide by the agreement. Instead, Marrese would perform both procedures himself, apparently at a lower total cost to the patient. Marrese also became an aggressive and effective competitor in other ways.
 
 
 10
 Competing orthopaedic surgeons, who were Academy members, did not take kindly to Marrese's competition. Therefore, according to Marrese, they conspired with the Academy to deny him membership and its attendant privileges. The Academy apparently joined the conspiracy, according to Marrese's theory, because its purpose was to stifle competition by protecting local members from renegades such as Marrese.
 
 
 11
 Excluding Marrese from Academy membership did not force Marrese to "play ball," so stronger action was necessary. Therefore, Marrese's competitors set out to drive Marrese from Evansville by using the peer review process to deny him hospital privileges at Deaconess. This ploy succeeded, and thus lowered the output of spinal orthopaedic surgical services in the Evansville market.
 
 
 12
 Given this scenario as Marrese sees it, we now proceed to a legal analysis of his theories.
 
 II.
 
 13
 Section 1 of the Sherman Act outlaws conspiracies that unreasonably restrain trade. 15 U.S.C. § 1; Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co., 472 U.S. 284, 289 (1985); Consolidated Metal Products, Inc. v. American Petroleum Institute, 846 F.2d 284, 289 (5th Cir.1988). To defeat the Academy's summary judgment motion, Marrese had to produce evidence from which a reasonable fact-finder could find both a conspiracy and an unreasonable restraint of trade.
 
 
 14
 Although Marrese's original complaint alleged a conspiracy to deny him membership in the Academy, Marrese now focuses much of his fire on the peer review process that resulted in the loss of his privileges at Deaconess Hospital. A hospital peer review process can restrain trade by decreasing the number of doctors in a given specialty in a market, thus decreasing competition and output of medical services. But this does not always give rise to an antitrust violation because doctors who supervise medical care providers--such as the Evansville orthopaedic surgeons who initiated and conducted the peer review in this case--may take the steps necessary to ensure quality treatment for patients. Thus, use of the peer review process to revoke a doctor's privileges does not violate the antitrust laws if the defendants had legitimate medical reasons for terminating the plaintiff's privileges. Johnson v. Nyack Hosp., 964 F.2d 116, 121 (2d Cir.1992); see also Miller v. Indiana Hosp., 843 F.2d 139, 143 (3d Cir.) (hospital and staff who revoke plaintiff's staff privileges are absolved from antitrust liability if the revocation was for "professional incompetence and unprofessional conduct"), cert. denied, 488 U.S. 870 (1988).
 
 
 15
 As we noted earlier, Marrese filed a separate suit challenging the peer review process at Deaconess. We have recently upheld the district court's decision to grant summary judgment in that case. Marrese v. Deaconess Hospital, No. 90-1494 (7th Cir., June 1, 1992). The basis for that decision was that Marrese had not presented sufficient evidence from which a reasonable fact-finder could find that the defendants involved in the peer review process had not acted in "good faith"--that is, Marrese could not prove that the defendants were motivated by a "primary purpose other than the safeguarding of patients." Id. at 12 (citation omitted).
 
 
 16
 The decision in the Deaconess case collaterally estops Marrese from asserting in this case that his privileges were revoked for any reason other than "the safeguarding of patients" which, it goes without saying, is a legitimate medical reason. All the elements of collateral estoppel, which prevents a party from relitigating an issue he has already litigated and lost, are present here. The issues in this case and Deaconess are the same: whether Marrese's hospital privileges were revoked for a valid medical reason. Marrese was a party to the Deaconess case, the resolution of the issue was necessary to the decision in Deaconess, and the issue was actually litigated and decided in that case. See Gilldorn Savings Ass'n v. Commerce Savings Ass'n, 804 F.2d 390, 392 (7th Cir.1986) (setting forth elements of collateral estoppel). Marrese has already had one fair opportunity to litigate the reason for the revocation of his privileges at Deaconess and lost; "one fair opportunity to litigate an issue is enough." Id. Because the revocation of Marrese's privileges was for legitimate medical reasons, that revocation was not an antitrust violation.
 
 
 17
 Even aside from collateral estoppel, Marrese cannot hold the Academy liable under the Sherman Act for the revocation of his privileges at Deaconess because Marrese has not presented any evidence to link the Academy to that revocation. There is no evidence that the Academy--as opposed to some of its members in Evansville--had anything to do with the peer review process. Marrese argues that the members acted as agents for the Academy, and that the Academy is liable for the conduct of its agents. But this is an odd concept of agency; a member of an organization is not the organization's agent for all purposes, and there is no evidence they were designated as agents for this purpose.
 
 
 18
 Although he partially relies on it, American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp., 456 U.S. 556 (1982), does not help Marrese. In Hydrolevel, the Supreme Court held that a standard setting association may be held liable for the antitrust violations of its agents made within their apparent authority. But in Hydrolevel, it was clear that the people who committed the antitrust violation were agents of the defendant: they were officers of the defendant, purporting to act officially in the defendant's behalf in setting an industry standard. See id. at 559-566. In this case, the Evansville members were not officers of the Academy, or members of any board or committee of the Academy, and there is no hint that they purported to act with the Academy's authority, apparent or otherwise.
 
 
 19
 Marrese also argues that the Academy was part of a "continuing conspiracy." His argument seems to be that the fact that the Academy never acted on his second membership application shows that the original conspiracy to deny him membership because of his refusal to abide by the Evansville "gentleman's agreement" was still ongoing. As a member of the conspiracy, the Academy would be liable for the acts of its coconspirators--the local members--in furtherance of the conspiracy, such as the revocation of his privileges at Deaconess.
 
 
 20
 All this assumes that there was sufficient evidence to find that the Academy and the local members ever conspired in the first place. We do not think there was. The only evidence of any conspiracy between the Academy and the Evansville members is some uncomplimentary letters that several of the Evansville members sent to the Academy when it requested information to help it process Marrese's application. The fact that some of the members sent derogatory letters to the Academy, however, is not sufficient to prove a conspiracy between the Academy and its members. Cf. Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 762-64 (1984) (evidence that distributors complained to a supplier about a price-cutting competitor does not establish a conspiracy between the distributors and supplier, even when the supplier terminated the price-cutter "in response to" the complaints). Any inference of conspiracy in this case is especially unreasonable given the facts that the Academy solicited information from doctors who did not compete with Marrese, and that several Evansville orthopaedic surgeons actually wrote complimentary letters about Marrese to the Academy. Marrese argues that the Academy always does its local members' bidding; but that argument is not itself evidence, and Marrese cites no evidence to support that argument.
 
 B.
 
 21
 This brings us to the original reason Marrese filed his lawsuit: his exclusion from membership in the Academy. Marrese first argues that this was a group boycott or concerted refusal to deal, and thus condemned as per se unlawful under the Sherman Act. Assuming that the proper characterization of the Academy's activity is a group boycott, not all group boycotts are per se illegal. Per se analysis is reserved for activities that "always or almost always tend to restrict competition and decrease output...." Northwest Wholesale Stationers, 472 U.S. at 289-90. We agree with the district court, for reasons that will become obvious in our further discussion of Marrese's exclusion from membership, that mere exclusion from membership from a Society like the Academy is not the type of activity that constitutes a per se violation of the Sherman Act.
 
 
 22
 We have already found that Marrese has not presented sufficient evidence to find that the Academy conspired with its Evansville members. The Academy argues that that decides the case: if there was no conspiracy between the Academy and its members in Evansville, there was no conspiracy, period. The district court, however, found that "to the extent that the [Academy's] Admissions Committee members worked together to arrive at a recommendation and to the extent that the Board decided to reject the application, there was concerted activity among Academy members." The Academy challenges this finding. However, whether this statement is correct need not trouble us, because Marrese's claim involving his exclusion from membership fails for another reason.
 
 
 23
 "There can be no restraint of trade without a restraint." Schachar v. American Academy of Ophthalmology, Inc., 870 F.2d 397 (7th Cir.1989). As in Schachar, "[t]hat truism decides this case." Id. Marrese has not shown that denial of membership restrained trade, that is, restricted the output of orthopaedic surgery services in any relevant market, or diminished Marrese's "ability to peddle [his] wares...." Id. at 399. The Academy did not prevent members from associating with or referring patients to Marrese; in fact, he admitted he received referrals from Academy members. Marrese was welcome to, and did, attend Academy meetings. Academy membership was not necessary to take board exams or receive a medical license, and the Academy did nothing to prevent Marrese from sitting for his exams or receiving his license. The Academy had no authority over hospitals, and did not even attempt to persuade hospitals not to allow Marrese to perform surgery. Academy membership was not necessary to receive hospital privileges. The Academy did not even prevent Marrese from joining other medical societies; he was a member of several, including the American Medical Association.
 
 
 24
 Marrese contends that membership in the Academy is a prerequisite for membership in two subspecialty societies, the American Orthopaedic Society for Sports Medicine, and the American Society for Surgery of the Hand. But there is no evidence that membership in these societies is necessary to practice sports medicine or hand surgery. In other words, there is no evidence of any restraint of trade. In any event, the only evidence that membership in the Academy was even necessary for membership in these subspecialty societies was Marrese's own affidavit. Under Fed.R.Civ.P. 56(e), affidavits "shall be made on personal knowledge ... and shall show affirmatively that the affiant is competent to testify to the matters stated therein." There is nothing in Marrese's affidavit indicating how he would know the membership requirements of the subspecialty societies. For example, Marrese does not claim to have read the societies' bylaws, or to have been rejected for membership in those societies because he was not an Academy member. Absent that foundation, Marrese's assertion is not competent evidence that Academy membership is necessary to join the two subspecialty societies.[2]
 
 
 25
 Marrese argues that denying him membership in the Academy disables him from competing effectively because it "stigmatizes" him. Marrese likens acceptance into the Academy to a "seal of approval." We rejected an argument of the same flavor in Schachar. In that case, the American Academy of Ophthalmology labeled a surgical procedure "experimental." This undoubtedly "stigmatized" the plaintiffs who performed the procedure. But we held that absent any effort by the Academy of Ophthalmology to actually restrain the plaintiffs from practicing the surgical procedure, there was no antitrust violation. See Schachar, 870 F.2d at 398-400; see also Consolidated Metal Products, 846 F.2d at 295-97 (trade association's withholding a seal of approval does not violate the antitrust laws where the association does not constrain others to follow its recommendation).
 
 
 26
 This case is no different than Schachar. Marrese argues that the lack of the Academy's imprimatur makes it harder for him to receive referrals or attract new associates. Even if that is true,[3] it does not prove an antitrust violation. There is no evidence that the Academy actually prevents anybody--members, non-members, hospitals, or patients--from dealing with non-members. If doctors on their own decide not to refer patients to or associate in practice with non-Academy members, that is their own decision. As in Schachar, the "stigma" Marrese complains about affects only demand, not supply. If the Academy is mistaken in its judgment about Marrese's ability, "the remedy is not antitrust litigation but more speech--the marketplace of ideas." Schachar, 870 F.2d at 400.
 
 
 27
 Marrese may be upset that the Academy has not deemed him worthy of membership. He perceives some sort of animosity, but "[a]nimosity, even if rephrased as 'anticompetitive intent' is not illegal without anticompetitive effects." Id. He may be upset that he has to wear a pink badge at meetings rather than different-colored badge that Academy members wear. But absent any actual restraint of trade by the Academy, Marrese has no antitrust case. After twelve years, Marrese has not been able to show any such restraint. It is time finally to put this case, with its attendant drain on the Academy's and the courts' resources, to rest.
 
 
 28
 AFFIRMED.
 
 
 
 *
 Hon. Floyd R. Gibson, Senior Judge for the Eighth Circuit Court of Appeals, is sitting by designation
 
 
 [1]
 In the district court, Marrese also complained about the loss of his privileges at St. Mary's Hospital in Evansville. Marrese's appellate brief, however, focuses only on the peer review process at Deaconess. Because of his failure to argue about the peer review process at St. Mary's, Marrese has waived any argument that that process and the loss of his privileges at St. Mary's violated the antitrust laws
 
 
 [2]
 This is typical of Marrese's approach to litigation. Of all the citations to the record in this brief, only a handful--5 to 10 at most--cite to anything other than his own affidavits. Regarding the Academy and its activities, only two factual assertions in Marrese's brief are supported by anything other than citation to his own affidavits. This would not be a problem if Marrese's affidavits provided admissible evidence of what he asserts. But in most cases, they do not. For example, Marrese states in his affidavit that the Academy is "nothing less than the primary institution by which practicing orthopedic surgeons proceed to limit the supply and the cost of orthopedic surgery in the United States." This is nothing more than Marrese's speculation; nothing in Marrese's affidavit gives any clue as to why this "fact" would be within his personal knowledge. This is just an example; to give others would be piling on. Suffice it to say that Marrese seems to be under the impression that any "fact" he puts in an affidavit automatically becomes competent evidence and therefore creates a genuine factual issue, even if nothing in the affidavit indicates how in the world Marrese could ever know about that "fact."
 
 
 [3]
 Again, the record supports neither of these assertions. The record shows that Marrese received referrals from Academy members. As for attracting new associates, Marrese testified at his deposition that he could not recall ever discussing Academy membership with any prospective new associates. The only evidence that new orthopedists avoided him is his own affidavit, which contains no indication as to how he would know the reasons for their avoidance